UNITED STATES of America and New Jersey Department of Environmental Protection, Plaintiffs–Intervenors,

v.

ROHM & HAAS COMPANY, E.I. Dupont De Nemours & Company, Owens–Corning Fiberglass, Hercules, Inc., The Glidden Company, SPS Technologies, Inc., Allied Paper, Inc., Triangle Publications, Inc., The Gilbert Spruance Company and Betz Laboratories, Inc., Defendants,

v.

John CUCINOTTA, Firestone Tire & Rubber Co., Technitrol, Inc., American Packaging Corp., Lek's, Inc., Crown, Cork & Seal, Inc., National Vulcanized Fiber, Inc., Continental Can Company,

NL Industries, Inc., AT & T Corp., Essex Chemical Corp. and Mantua Township, Third–Party Defendants.

Civ. No. 85–4386.

United States District Court,
D. New Jersey.

Sept. 29, 1989.

668

Joseph Hurley, Paul Chassy, Environmental Enforcement Section, Land & Natural Resources, U.S. Dept. of Justice, Washington, D.C., James C. Woods, U.S. Dept. of Justice, Newark, N.J., and Helene Cohen, Office of Regional Counsel, U.S. E.P.A., New York City, for plaintiff U.S.

Kenneth W. Elwell, Deputy Atty. Gen. and Neal Brody, N.J. Dept. of Environmental Protection, Office of Regulatory Services, Trenton, N.J., for plaintiff New Jersey Dept. of Environmental Protection.

Julia Lambeth Phillips, E.I. DuPont de Nemours & Co. Legal Dept., Wilmington, Del., for defendant E.I. DuPont de Nemours.

Ann C. Hurley, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for defendant Owens–Corning Fiberglass.

Etta Ryan Clark, Hercules, Inc., Wilmington, Del., for defendant Hercules, Inc.

Louis T. Bolognini, Drinker, Biddle & Reath, Philadelphia, Pa., for defendants The Glidden Co. and Allied Paper.

Michael Nelson Becci, SPS Technologies, Inc., Newtown, Pa., for defendant SPS Technologies, Inc.

Frank E. Ferruggia, McCarter & English, Newark, N.J., for defendant Owens–Illinois.

Kevin Wall, Wall, Makowski & James, Oaklyn, N.J., for defendant Marvin Jones.

Paul F. Ware, David Mackey, Goodwin, Procter & Hoar, Boston, Mass., and Shanley & Fisher, Morristown, N.J., for defendant CBS.

Lee Thomason, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, N.J., for defendant Manor Health Care.

Bradford F. Whitman, Wendy Relation, Dechert, Price & Rhoads, Philadelphia, Pa., and James A. Nolan, Jr., Montano, Summers, Mullen, Manuel & Owens, Cherry Hill, N.J., for defendant Rohm & Haas Co.

Michael L. Krancer, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for defendant Triangle Publications.

Henry H. Janssen, Rapp, White, Janssen & German, Ltd., Philadelphia, Pa., and Seth Cooley, Duane, Morris & Heckscher, Philadelphia, Pa., for defendant The Gilbert Spruance Co.

James H. Decker, Betz Laboratories, Inc., Trevose, Pa., for defendant Betz Laboratories.

Paul E. Gutermann, Squire, Sanders & Dempsey, Washington, D.C., and George C. Jones, Ribis, Graham, Verdon & Curtin, Morristown, N.J., for third-party defendant Firestone Tire & Rubber.

John Wilmer, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for third-party defendant Technitrol.

Jonathan Petrakis, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for third-party defendant American Packaging Corp.

Jeffrey J. Norton, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for third-party defendant Leksi, Inc.

Joseph J. Castano, Waters, McPherson, McNeill & Fitzpatrick, Secaucus, N.J., for third-party defendant Crown Cork & Seal.

Jane A. Lorber, Brown & Connery, Westmont, N.J., and J. Bradford McIlvain, Reed, Smith, Shaw & McClay, Philadelphia, Pa., for third-party defendant Nat. Vulcanized Fiber, Inc.

Wayne Streitz, Streitz & Streitz, Pitman, N.J., for third party-defendants John and Joseph Cucinotto.

Terrance Dwyer, William, Caliri, Miller & Otley, Wayne, N.J., for third-party defendant Continental Can Co.

Susanne Peticolas, Ruth Rosenberg, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., for third-party defendant NL Industries, Inc.

Kenneth H. Mack, Picco, Mack, Kennedy, Jaffe, Perrella & Yoskin, Trenton, N.J., for third-party defendant Essex Chemical.

Mark Kundla, Bumgardner, Hardin & Ellis, Springfield, N.J., for third-party defendant Mantua Tp.

GERRY, Chief Judge.

## I. INTRODUCTION

Before us today is a motion for entry of a partial consent decree, which embodies a so-called *"de minimis"* settlement negotiated pursuant to § 122(g) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 42 U.S.C. § 9622(g).[1] The settlement resolves the United States and the State of New Jersey's claims against certain parties in this action pursuant to § 107(a) of CERCLA, 42 U.S.C. § 9607(a), to recover costs incurred for enforcement, investigation and clean-up activities at the Lipari Landfill in the Township of Mantua, Gloucester County, New Jersey.

The decree was lodged with this court on July 28, 1988, as was a fact sheet explaining EPA's determination to enter into the decree. United States Exhibits 1 & 2. On August 8, 1988, the United States published a notice of the lodging of the decree

---

1. This provision, like many others in CERCLA, was added by Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499

("SARA"), and became effective on October 17, 1986.

inviting public comment on the proposed settlement. Fed.Reg. 12613 (Aug. 8, 1988); U.S. Ex. 3. The United States received three sets of comments on the proposed settlement from three defendants who are not parties to the settlement. U.S. Ex. 4–6. The United States, or more specifically the Environmental Protection Agency ("EPA"), reviewed these comments and decided to move this court for entry of the Partial Consent Decree. U.S. Ex. 7 & attachments. The motion is before us now and is joined in by the settling defendants.[2]

The motion is opposed by certain defendants to this action. Rohm & Haas, which is alleged to have contributed 46,507 55–gallon drums out of the estimated 54,361 drums of the hazardous waste dumped at Lipari, opposes entry of the decree on the grounds that the settling parties' payment does not adequately reflect their proportionate share of the waste at Lipari. Rohm & Haas asserts that the plaintiffs are allowing the settlors to cash out so cheaply because they can recover any shortfall, which could run into the millions of dollars, from the remaining defendants. The non-settlors will bear this risk, because the settlement extinguishes their contribution rights vis-a-vis the settlors and leaves the defendants with only a credit in the amount of the settlement. Another defendant, Manor Health Care ("Manor Health"), the successor company to a waste haulage firm, objects to and seeks to enjoin the proposed consent decree because it has not been permitted to participate as a *de minimis* party, while its predecessor's customers have. These objections will be dealt with during our evaluation of whether to enter the proposed consent decree.

On August 9, 1989, this court held a lengthy hearing on the proposed consent decree, in which it entertained argument from the United States on behalf of itself and the State of New Jersey; by the objecting defendants, Rohm & Haas and Manor Health Care; and by several of the *de minimis* settlors. The presentations made at that oral argument, voluminous briefs and the record evidence compiled by all parties informs the analysis that follows.

## II. FACTUAL BACKGROUND

The landfill site, as we have indicated in a previous opinion, *see* 669 F.Supp. 672 (D.N.J.1987), occupies approximately six acres in Mantua Township, New Jersey. It is bordered by two streams.

Beginning in 1958, the Landfill's owner, Nicholas Lipari, accepted chemical and industrial wastes for deposit at the site. Overall, the United States now estimates that 55,782 55–gallon drums, or approximately 3,068,010 gallons, of liquid wastes were deposited at Lipari before it was closed by the State of New Jersey in 1971. A variety of hazardous substances, including benzene, chromium, lead, zinc and arsenic, have been detected at the site and on areas adjacent to and down gradient from the Landfill.[3] The Lipari Landfill has the dubious honor of being the number one site on the National Priorities List, a ranking of hazardous waste sites based on potential threat to human health and the environment. 42 U.S.C. § 9605(c); 40 C.F.R. Part 300, Appendix B; U.S. Ex. 2 at 1.

The United States has responded to the situation at Lipari by undertaking or preparing to undertake three phases of remedial action. During Phase I, the EPA installed a slurry wall encircling 16 acres of contaminated soil and groundwater, topped by an impermeable cap. *See* Record of Decision ("ROD") for Phase I, U.S. Ex. 9. Costs incurred through June 1, 1988 for Phase I, and for Phases II and III, are approximately $10,500,000. U.S. Ex. 7, Attachment 1. Phase II, selected by EPA on September 30, 1985, consists of a flushing system, and its estimated price tag is $33,-

---

2. Throughout the opinion, we will refer to the moving governmental parties as the United States or the Government. By this we mean collectively the United States and the State of New Jersey.

3. According to the fact sheet which explains the factors EPA considered in entering this settlement, "[t]he wastes disposed of at the site include solvents, paints and paint thinners, phenol and amine wastes and residues, as well as resins, estes press cakes and other chemicals and industrial wastes." U.S. Ex. 2.

800,000. ROD for Phase II, U.S. Ex. 10, 10A; U.S. Ex. 7, Attachment 1. On July 11, 1988, EPA selected the Phase III remedy which will address off-site contamination. *See* ROD for Phase III; U.S. Ex. 11. Its cost is projected at $20,970,000. U.S. Ex. 7, Attachment 1. Thus, total costs for remedial action are currently estimated at $65,270,000.[4]

On September 10, 1985, the United States filed a complaint under § 107 of CERCLA against Rohm & Haas Company, Inc., Owens–Illinois, Inc., CBS Records, Inc., Almo, Inc., Cenco, Inc., Manor Health Care Corporation and Marvin Jonas, Inc.[5]

The complaint seeks to recover costs already incurred in responding to the problem at Lipari, as well as a declaratory judgment on liability for future costs. The complaint alleges that Rohm & Haas, CBS Records and Owens–Illinois were parties that arranged with a transporter for disposal or treatment of hazardous substances

they generated, and that Almo and Marvin Jonas transported these hazardous substances to the Lipari Landfill. *See* 42 U.S.C. 9607(a)(3), (4) ("generators" and "transporters," respectively). Cenco and Manor Health were named as successor corporations to Almo.

In January 1986, the State of New Jersey intervened pursuant to § 104(c) of CERCLA, 42 U.S.C. § 9604(c), to recover its 10 percent share of the response costs incurred. On July 28, 1988, the United States filed an amended complaint and named Triangle Publications, Inc., The Glidden Company, E.I. DuPont deNemours & Co., Allied Paper, Inc., Owens–Corning Fiberglass Corp., SPS Technologies, Inc., The Gilbert Spruance Company, Betz Laboratories, Inc., and Hercules, Inc. as additional defendants. These nine defendants are parties to the proposed consent decree which was filed with the court on the same day.

---

**4.** This overview of remedial action expected at the site is quite preliminary in nature. The adequacy of the administrative process which resulted in these three phases, and the consistency of the remedies therein advocated or completed with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300, has yet to be determined. For our earlier exploration into these issues with respect to Phase One, *see* 669 F.Supp. 672 (D.N.J.1987).

**5.** Section 107(a) of CERCLA, 42 U.S.C. 9607(a), provides: Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 104(i) [42 USCS § 9604(i)].

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified tor interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of the Internal Revenue Code of 1954 [26 USCS §§ 9501 et seq.]. For purposes of applying such amendments to interest under this subsection, the term "comparable ma. rity" shall be determined with reference to the date on which interest accruing under this subsection commences.

## III. THE PROPOSED CONSENT DECREE

### A. *Its Terms*

The decree embraces 12 parties: the two plaintiffs, the United States and the State of New Jersey; one original defendant, CBS Records, and the nine defendants added by the amended complaint. It requires the settlors to pay a total of $3,034,807. Proposed Consent Decree, § III, U.S. Ex. 1. Approximately $2,586,000 is slated to partially reimburse the United States for its response costs, and $287,000 will be paid to New Jersey toward its claim for response costs. New Jersey will receive an additional $161,220 as payment for potential damages to natural resources within its jurisdiction.

In return for these payments the settlors receive a release from liability for all claims related to Lipari. The United States and the State of New Jersey covenant not to sue for future civil claims under §§ 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607, and § 7003 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6973. U.S. Ex. 1, § V. New Jersey has provided the settlors with releases from liability under the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10–23.11 *et seq.*, the Water Pollution Control Act, N.J.S.A. 58:10A–1 *et seq.*, and any other state statutory and common law. In addition, the United States Department of Interior and the State of New Jersey have provided releases for damages to any natural resources within their respective jurisdictions. *Id.* Finally, the decree grants the settlors contribution protection from the remaining defendants, i.e., the non-settling defendants, in accordance with §§ 113(f)(2) and 122(g)(5) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(g)(5), which we will discuss shortly. *Id.*, § VII. It is this feature, or more properly this effect, of the settlement which has impelled the objections of Rohm & Haas and Manor Health.

The decree contains two "reopener" provisions. The first allows the plaintiffs, and non-settling defendants, to seek relief from the settlors if information not currently known shows that a settling party is no longer eligible for *de minimis* status, defined in the agreement as a volumetric contribution to the Landfill of 1 percent or less. In negotiating the settlement, the United States used as a rule of thumb the notion that a *de minimis* party was one which had contributed 1 percent or less of the waste at Lipari. Indeed, each settling party was required to and has certified that it contributed less than 1 percent of the hazardous waste at Lipari.

The second reopener allows the plaintiffs and any other parties to seek relief from any of the settling parties if total response costs exceed $94 million. *Id.*, § VI. According to the United States, this figure was selected because:

> ... during negotiations an off-site remedy had not been selected, but the United States desired to establish a settlement figure which accounted for unknown future costs while still providing for a premium payment and ensuring that the United States at least received an amount that represented the *de minimis* settlor's volumetric share of the costs. Since the settlors cumulatively were considered responsible for approximately 3.0% of the waste at the site during the negotiations, the selection of the $94 million reopener along with the settlement amount of $2.87 million ensured that all of these goals were accomplished.

United States Brief at 11.

Even though the United States now views the best estimate of the settlors' volumetric contribution to be 4.23 percent, it still believes the $94 million reopener is adequate, since the settlors are still bearing approximately their proportionate share and might be contributing a premium, since they could have contributed even less than the 3.0 percent used to select the $94 million reopener.

Rohm & Haas, as we shall see, believes these reopeners are inadequate. It contends that the evidence currently in the record demonstrates that the settling parties are responsible for over 10 percent of the hazardous waste at Lipari and there-

fore should be paying almost $4 million more.

### B. *Background*

The United States and Rohm & Haas agree that it was, rather ironically, Rohm & Haas which initiated and drove the process that led to the proposed decree. They part company with respect to what affect this had on the settlement ultimately agreed upon by the Government and the settlors.

Rohm & Haas avers that after settlement negotiations between the original defendants and the United States failed it approached the United States about the possibility of identifying other parties potentially responsible for the clean-up of Lipari Landfill ("potentially responsible parties" or "PRPs"). The United States evinced very little interest in this proposal, being quite content to recover its response costs from the then named defendants. Therefore, it was Rohm & Haas which undertook primary responsibility for identifying other PRPs. The purpose of this process, according to Rohm & Haas,

> was to develop a "cash-out" agreement whereby these generators would settle all claims relating to Lipari Landfill by paying a lump-sum amount in return for a covenant not to sue pursuant to CERCLA, Section 122(g), 42 U.S.C. 9622(g). The Government expressed little interest in conducting the discovery necessary to allocate the share of total costs to companies other than defendants Rohm and Haas, Owens–Illinois and Manor Health Care. Therefore, the burden fell on Rohm and Haas and the other defendants to investigate the extent of liability of the so-called *"de minimis"* parties.

Rohm & Haas Brief at 4–5.

To facilitate this process, United States Magistrate Jerome B. Simandle established a discovery period to identify other PRPs. Discovery was stayed, except insofar as it was directed at identifying such PRPs. Numerous depositions were taken, most important of which was that of Marvin Jonas, whose company had transported large amounts of Rohm & Haas waste to Lipari. During his deposition, Jonas said that he had transported to Lipari the waste of several generators that were not named as defendants in the original complaint. Jonas Deposition of April 17, 1986; U.S. Ex. 12. By way of this deposition, and from the records of those companies mentioned by Jonas, and from further discovery taken from Nick Lipari, other PRPs were identified.[6] Through this discovery, Rohm & Haas was able to persuade the United States that these parties were responsible for the Lipari response costs.

On October 10, 1986, counsel for Rohm & Haas drafted and transmitted a proposed settlement agreement and release. Whitman Certification, Rohm & Haas Ex. 1. Under this proposal seven companies identified during this discovery process (seven of the ten who are parties to the proposed consent decree) would have paid $2.6 million in return for a release of liability for all claims relating to Lipari. U.S. Ex. 4, Attachment 1A. This figure, Rohm & Haas says, was premised on its belief that the total response costs at Lipari would be $20 million, and EPA's belief that $26 million, given the potential for cost overruns, was a "liberal" estimate of the potential response costs. Whitman Cert., Rohm & Haas Ex. 1; U.S. Ex. 7, Attachment 1.[7] At a meeting on October 14, 1986, Rohm & Haas presented its settlement to the parties and explained that the $2.6 million figure was premised on estimated clean-up costs of $20 million. *Id.* Rohm & Haas viewed the settlement as representing a 10 percent share of the waste at Lipari, plus a

---

**6.** Rohm & Haas even utilized private investigators to attempt to discover other parties potentially responsible for the hazardous waste dumped at Lipari.

**7.** The use of $20 million as a figure was based on Rohm & Haas's understanding of the EPA's then existing estimates for the three phases of the Lipari clean-up. The portions of the administrative record which Rohm & Haas relied on are cited at pages 2–4 of its brief. Because of the nature of this matter, we ask that the parties submit additional copies of their briefs for inclusion in the official record. The Clerk's Office will be directed to file these briefs, a practice which is not required under our Local Rules.

674

$600,000 "premium" for an early "cash-out," whereby the settling parties pay additional funds above their volumetric share of the waste in exchange for avoiding the possible joint and several liability and substantial litigation costs which accompany being a CERCLA defendant.

On November 13, 1986, the United States "preliminarily endorsed" the $2.6 million figure. U.S. Ex. 33. This approval, says Rohm & Haas, was at that time based on EPA's view that the settlement constituted a payment for the seven settlors' estimated 5 percent share of the waste, plus a 5 percent premium for an early cash-out. Rohm & Haas Brief at 7–8; U.S. Ex. 7, Attachment 1.

Under either of these scenarios, Rohm & Haas was prepared to support the settlement. However, in 1988, Rohm & Haas learned that EPA's estimate of the response costs had soared from $26 million to $65 million after completion of the Remedial Investigation and Feasibility Study ("RI/FS") pursuant to § 104(b) of CERCLA, 42 U.S.C. § 9604(b).[8] Further, three other companies, Gilbert Spruance, Allied Paper and Betz Laboratories, joined the original settlors. Despite this, the United States entered into a settlement with these ten parties for only $360,000—$200,000 for response costs, and $160,000 for natural resource damages—more than the $2.6 million figure originally proposed by Rohm & Haas.

Rohm & Haas urged the United States to demand a markedly higher dollar figure from these PRPs in light of the new circumstances. The United States' refusal to do so demonstrates, according to Rohm & Haas, the non-adversarial nature of this settlement. The United States did not pursue these settlors with the vigor one usually associates with plaintiffs. Rather, it went along with the *de minimis* process so long as it was convenient for it to do so; i.e., while Rohm & Haas was doing all the work, but was never committed to striking a fair bargain which would exact an adequate sum from the *de minimis* PRPs. After all, notes Rohm & Haas, these PRPs were not targets chosen by the United States, and the Government never wished to devote much time to pursuing them since it already had strong cases against Rohm & Haas and Owens–Illinois. Moreover, the United States believed that the non-settlors, as opposed to itself, would bear the brunt of a bad settlement. As such, it had little incentive to engage in a hard-fought bargaining process.

The United States and the settling PRPs vehemently differ with Rohm & Haas's characterization of the bargaining process. With respect to the increase in response cost estimates which occurred after Rohm & Haas circulated its draft settlement, the United States insists that it never viewed the original settlement figure as being contingent on clean-up estimates of $26 million or lower. It points out that any estimates

**8.** 42 U.S.C. § 9604(b)(1) provides in relevant part:

Whenever the President is authorized to act pursuant to subsection (a) of this section, or whenever the President has reason to believe that a release has occurred or is about to occur, or that illness, disease, or complaints thereof may be attributable to exposure to a hazardous substance, pollutant, or contaminant and that a release may have occurred or be occurring, he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment. In addition, the President may undertake such planning, legal, fiscal, economic, engineering,

architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this Act.

During the RI/FS process, the EPA investigates the alternatives for cleaning up a hazardous waste site. At the end of this study, EPA identifies a preferred alternative. A period follows in which comments are solicited on this alternative. After evaluating these comments, together with all other relevant information, EPA selects a remedy by issuing a Record of Decision ("ROD").

The ROD presents the remedy in general terms and an estimate of its costs. The figure may change during the remedial design phase when detailed engineering plans are developed to implement the general remedial concept. *See generally* 40 C.F.R. ¶ 300.

of response costs, especially those attributable to the Phase III off-site remedy, were necessarily speculative prior to completion of the RI/FS process, a fact that Rohm & Haas was repeatedly made aware of and seemed to recognize. U.S. Exs. 34–37.

During the negotiating process, the United States insists that it engaged the settlors in lengthy and hard-fought bargaining. The settlors demanded a complete release from liability for claims related to Lipari. The United States refused this demand and insisted upon the inclusion of the two reopeners described earlier.[9] Moreover, many of the settlors originally offered to pay significantly lower dollar contributions than what were eventually agreed upon. The United States held out for and eventually accepted a dollar settlement which constituted 90 percent of its original demand.

At oral argument, counsel for the United States and for some of the *de minimis* settlors represented to the court that the settlement was a good-faith compromise of this litigation. Counsel for the *de minimis* settlors assured the court that the United States was a tough and largely unyielding adversary. Counsel for the United States accorded equal respect to counsel for the settlors, who, it says, consistently made suggestions for inclusions or deletions from the United States settlement proposal and never hesitated to point out the weakness of the case against their clients.

Rohm & Haas does not contest these assertions of good-faith. It does not deny that there were proposals and counter-proposals, drafts and counter-drafts. Rather, Rohm & Haas believes that the settlement was not the product of truly spirited negotiating because the United States felt it had nothing at risk, and thus lacked the underlying incentive to hold out for a fair deal. The United States would not, Rohm & Haas asserts, have entered into this settlement, negotiated based on a response costs estimate of $26 million, if it bore the risk that this was a bad settlement. It was only because the Government believed that Rohm & Haas and the other non-settling defendants would be responsible for making up any underpayment by the settlors that it allowed the ten settlors, among whom are corporate titans like DuPont and CBS Records, to cash out so cheaply.

To fully understand this argument, one must recognize the effect a CERCLA *de minimis* settlement has on the contribution rights of a non-settling PRP, such as Rohm & Haas. It is to that subject that we now direct our attention.

## IV. THE CONSENT DECREE AND NON–SETTLORS' CONTRIBUTION RIGHTS

CERCLA ordinarily accords any potentially responsible party, such as Rohm & Haas, the right to seek contribution from other PRPs during or following any action under §§ 106 or 107(a). § 113(f)(1) of CERCLA; 42 U.S.C. § 9613(f)(1). In resolving such claims, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Id.*

However, the contribution rights of PRPs vis-a-vis defendants who settle a CERCLA action with the United States or a state are extinguished by such a settlement. Under the proposed consent decree's provisions, the non-settling defendants, and any unidentified PRPs, would be barred from seeking contribution from any of the settling defendants. In lieu of such rights, any potential liability of the non-settlors would be reduced by the amount of the settlement. U.S. Ex. 1, § VII. Therefore, if the United States obtains a judgment of X dollars against all the PRPs and Rohm & Haas satisfies that entire judgment, it will only receive a credit in the amount of the settlement even if the amount of the settlement is only 4.4 percent of X and Rohm & Haas can show that the settlors' equitable share is 10 percent of X—a scenario which under comparative fault principles would ordinarily give rise

---

9. The $94 million reopener, the United States concedes, was derived from use of a $26 million estimate for response costs.

to a contribution right in Rohm & Haas since it had satisfied more than its equitable share of a joint liability. This result, the United States argues and Rohm & Haas fears, is dictated by two specific CERCLA provisions added by the SARA amendments which address the effect CERCLA settlements have on non-settling parties.

The first of these provisions, § 113(f)(2), applies generally to CERCLA settlements involving governmental plaintiffs and provides:

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

42 U.S.C. § 9613(f)(2). The second provision, § 122(g)(5), directly addresses the effect of a *de minimis* settlement upon non-settlors' contribution rights:

> A party who has resolved its liability to the United States under this subsection [§ 122(g)] shall not be liable for claims for contribution regarding matters addressed in the settlement. *Such settlement does not discharge any of the other potentially responsible parties unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.*

42 U.S.C. § 9622(g)(5). (Emphasis added.)

While non-settlors lose their contribution rights, defendants who are parties to a CERCLA settlement retain the right to seek contribution from the *non*-settling PRPs. 42 U.S.C. § 9613(f)(3)(B). And, of course, the Government retains the right to bring or maintain an action and seek relief from non-settling PRPs if the settlement provides it with less than complete relief. 42 U.S.C. § 9613(f)(3).[10]

Prior to the 1986 SARA amendments, CERCLA had been silent as to whether defendants were jointly and severally liable for response costs, whether a right of contribution existed among PRPs, and therefore, of course, what effect settlements would have on non-settling PRPs' contribution rights. Courts, both pre- and post-SARA, have consistently held that defendants under CERCLA are jointly and severally liable where the harm at a particular waste site is indivisible. *United States v. Monsanto Company*, 858 F.2d 160, 171 (4th Cir.1988), *cert. denied, Monsanto Company v. United States*, —— U.S. ——, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *United States v. Northeastern Pharmaceutical and Chemical Company (NEPACCO)*, 579 F.Supp. 823, 844–845 (W.D.Mo. 1984), *aff'd in relevant part and reversed in part*, 810 F.2d 726 (8th Cir.1986), *cert. denied, sub nom., Armco, Inc. v. Maryland Casualty Co.*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Wade*, 577 F.Supp. 1326, 1337–39 (E.D.Pa.1983); *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 805–810 (S.D.Ohio 1983).

There was, pre-SARA, more dispute about how settlements would affect contribution rights, which were generally assumed to exist under CERCLA. *See State of Colorado v. ASARCO, Inc.*, 608 F.Supp. 1484, 1492 (D.Colo.1985) (citing cases). EPA tried to encourage settlements by agreeing to indemnify any party with whom it settled to the extent necessary to extinguish any contribution claims against that party. However, EPA did have a preference for resolving the effect of a settlement on non-settlors in accord with section four of the Uniform Contribution Among

---

**10.** "These provisions place non-settling CERCLA defendants at a disadvantage in two ways. First, it leaves them open to contribution claims from settling defendants who have paid more than their proportionate share of liability. Second, if settling defendants have paid *less* than their proportionate share of liability, section 113(f)(2) apparently compels the non-settlors to absorb the shortfall." *City of New York v. Exxon Corp.*, 697 F.Supp. 677, 681 n. 5 (S.D.N.Y. 1988).

Tortfeasors Act ("UCTA"), 12 Uniform Laws Annotated 63 (1975), which states:

> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
> (a) It does not discharge any of the other tortfeasors for liability for the injury or wrongful death unless its terms so provide; *but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater;* and
>
> (b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

*Id.* at 98; Interim Settlement Policy, 50 Fed.Reg. 5034, 5043 (Feb. 8, 1985) (emphasis added). At least one court, however, held that the rule articulated in the Uniform Comparative Fault Act, U.L.A. pocket part 40 (1989), was preferable to the UCTA for use under CERCLA. *United States v. Conservation Chemical Co.,* 628 F.Supp. 391 (W.D.Mo.1985).

Section 6 of the UCFA provides:

> A release, covenant not to sue, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, the claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation, determined in accordance with the provisions of Section 2.

U.L.A. pocket part at 51–52 (1989). Section 2 of the UCFA calls on courts to determine the percentage fault of the respective parties, including settlors, based on the nature of their conduct and its relation to the plaintiffs' damages. *Id.* at 45. In *Conservation Chemical,* Chief Judge Wright held that the effect of a CERCLA settlement "upon non-settling parties should be determined in accordance with the 1977 Uniform Comparative Fault Act for the reason that the principles of that model act are the most consistent with, and do the most to implement, the congressional intent which is the foundation for CERCLA." *Id.* at 402. In fact, one post-SARA opinion has indicated that the effect a consent decree to which the United States is a party has on non-settlors' contribution rights is to be determined in accordance with the UCFA. *United States v. Laskin,* Case No. C84–20354, 1989 U.S. Dist. Court, LEXIS 4900 (N.D.Ohio, February 27, 1989).

But, however interesting it might be, we need not, and may not, engage in a federal common law analysis to decide whether non-settling defendants should be credited with the proportional or equitable share of the liability attributable to the settling parties, the UCFA approach, or only with the settlement amount, the UCTA approach. By enacting § 113(f)(2) and § 122(g)(5) of CERCLA in 1986, Congress has plainly indicated that non-settling defendants' contribution claims will be barred, and they will be credited only with the amount of the settlement and nothing more. *Accord, Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution,* 712 F.Supp. 1019 (D.Mass.1989).[11]

■ We see no reason to deviate from this clear expression of congressional intent.[12] It would be puzzling indeed if

---

**11.** At least two federal courts have held that an equitable judgment reduction mechanism, in accord with the UCFA, applies to reduce the liability of non-settling PRPs in a CERCLA action. However, they did so in the context of a settlement among private parties, not involving the United States or a State. As such, § 113(f)(2) by its own terms did not apply. *See Lyncott Corp. v. Chemical Waste Management, Inc.,* 690 F.Supp. 1409 (E.D.Pa.1988); *Edward Hines Lumber Co. v. Vulcan Materials Co.,* No. 85 C

1142, 1987 WESTLAW 27368, 1987 U.S. Dist. LEXIS 11961 (N.D.Ill., Dec. 4, 1987).

**12.** Nor do we see a reason to avoid discussing this issue now since it is the source of the primary conflict before us. If we were to lead the parties to believe that these issues are open for later consideration, in the absence of new authority, we would be doing them a disservice. In fact, it has been urged by Rohm & Haas that the effect a proposed consent decree has upon non-settlors is relevant in determining the ap-

CERCLA, post-SARA, permitted a court to credit a non-settling defendant with the "equitable" share of the liability attributable to defendants who have resolved their liability to the United States or a State via a judicially approved settlement, since sections 113(f)(2) and 122(g)(5) seem much more closely modeled on the UCTA than on the UCFA. One suspects that Congress would have chosen somewhat different words than "reduces the potential liability of the other[ ] [non-settling potentially responsible parties] by the amount of the settlement," to express the view that non-settling parties should have their liability "reduced by the released person's equitable share of the liability." *Compare* 42 U.S.C. § 9622(g)(5) *with* UCFA, 12 U.L.A. pocket part 51–52.[13]

Moreover, the use of a UCFA proportional judgment reduction mechanism is inconsistent with Congress's intent to expedite "effective remedial action and minimize litigation." 42 U.S.C. § 9622(a); *City of New York v. Exxon Corp.*, 697 F.Supp. 677, 693 (S.D.N.Y.1988). It is undoubtedly true that a settlement bar raised under either a UCFA or a UCTA approach will provide PRPs with the peace required to induce them to enter into settlements. However, the use of a UCFA approach has a tremendous negative impact on the benefit the United States or a State could hope to receive from a settlement under CERCLA.

As one district court has aptly noted, if courts deviate from the plain language of § 113(f)(2) (and in our case § 122(g)(5)) and use a proportional mechanism:

> the responsibility of a settlor for damages would need to be fully litigated by the sovereigns and the non-settlors to determine the settlor's proportional share, thus largely duplicating the aspects—and expense—of the litigation the settlement was designed to avoid.

*Acushnet River*, 712 F.Supp. at 1027. In fact, the only parties which would avoid or decrease litigation expenses via such a settlement would be the settling defendants. The overall litigation would remain, insofar as the issues to be considered are concerned, as complex and unwieldy as it was prior to the settlement. The only difference would be that the United States and the relevant State rather than the settling defendants would litigate the contribution issues with the non-settlors. There would be no incentive for Government plaintiffs to enter into such settlements since by doing so they would not decrease their enforcement costs but, indeed, have to take on the burden of showing that the settling parties paid their equitable share. If the Government shirks this burden, it could be faced with covering the shortfall between the amount of the settlement and the settlors' equitable share of the response costs. In this situation:

---

propriate level of scrutiny to use in reviewing the fairness, reasonableness, and adequacy of the decree. Moreover, the objecting parties have fully briefed these issues and have urged us to address them. Finally, by its own terms, entry of the decree would determine this issue.

**13.** Section 113(f)(2) does differ from the UCTA insofar as § 4 of the UCTA is applicable to "good faith settlements." The CERCLA provision does not refer to "good faith settlements" but rather to "an administrative or judicially approved settlement." In fact, the early bills that preceded the enactment of SARA provided that Section 113(g)(2) applied to a "judicially approved good faith settlement." *See* H.R. 2817, § 113(g)(2), 99th Cong. 1st Sess., and H.R. Rep. No. 253, Part 1, 99th Cong., 1st Sess. 59 (1985). The reference to "good faith" was deleted in the House Judiciary Committee amendments and in the final legislation. The Committee explained:

> The Judiciary Committee amendment to this paragraph deletes "good faith" as an indepen-

dent requirement for obtaining immunity from contribution claims. The amendment recognizes that judicial examination and approval of the settlement itself is adequate to protect against improper or "bad faith" settlements. Before initially approving a consent decree under CERCLA, a court must satisfy itself that the settlement is reasonable, fair and consistent with the purposes that CERCLA is intended to serve. Because this process ensures that the "good faith" of the settlement is examined by the court, a supposedly separate requirement of good faith in the contribution section would lead to unnecessary confusion, would cast doubt on the availability of contribution protection under the section, and would lessen the incentive for settlement created by such protection.

H.R.Rep. No. 253, Part 3, 99th Cong., 1st Sess. 19 (1985), U.S.Code Cong. & Admin.News 1986, p. 3042.

It thus might cost the sovereigns more to settle with one party than not to settle since, if the sovereigns do not settle, they can merely prove that all ... defendants ... polluted and seek recovery from all or any one of them in any proportion the sovereigns choose because the defendants in such a case are generally jointly and severally liable.

*Acushnet River*, 712 F.Supp. at 1027, n. 14. We do not believe that this scenario, which follows from use of a proportional or equitable approach, is consistent with Congress's intention to facilitate the voluntary settlement of CERCLA litigation.

In sum, we believe that if this proposed decree is accepted by this court, then the non-settling PRPs will only receive a credit in the amount of the settlement.[14] This means that they bear the risk that the settling defendants are paying less than their equitable share. If, for example, the settling parties' volumetric contribution to the waste at Lipari is determined at trial to have constituted 10 percent of the waste at the site and this is their "equitable" share, and the settlement amount is only 4.4 percent of the response costs, then the non-settling parties will be liable for a portion of the response costs, which ordinarily they may have recouped, upon a proper showing, via contribution. As such a shortfall could constitute millions of dollars, the

harm to a non-settlor if the settlement does not reflect the settlors' equitable share is potentially large.

As a result of this potential harm, Rohm & Haas contends that this court has a duty to review very carefully the factual evidence linking the settling parties to the landfill. If the evidence is best read as suggesting that the settlement amount is grossly disproportionate to the settling defendants' most likely volumetric share of the waste, then Rohm & Haas argues that we must refuse to enter the consent decree. We evaluate this contention during consideration of the standard of review which must be applied to evaluate the proposed decree.

## V. STANDARD OF REVIEW

The consent decree presented for our approval was negotiated under § 122(g) of CERCLA, a provision added, as was § 122 in its entirety, by the 1986 SARA amendments. However, § 122(m) specifically provides that "[i]n the case of consent decrees and other settlements under this section ... no provision of this Act shall be construed to preclude or otherwise affect the applicability of general principles of law regarding the setting aside or modification of consent decrees or other settlements." 42 U.S.C. § 9622(m).

---

**14.** Rohm & Haas argues that by using the words "potential liability" rather than "judgment" in § 113(f)(2), Congress "did not limit a court's inherent power in adjudicating a CERCLA claim to award the Government less than the full amount of its claim minus the amount of the settlement." Rohm & Haas Supp. Brief at 12. This is suggested, Rohm & Haas says, by § 113(f)(3) which states that the United States "may," as opposed to shall, seek relief from other PRPs if it has obtained less than "complete relief" from a settlement with other parties. 42 U.S.C. § 9613(f)(3). "The fact that ... § 113(f)(3) did not *require* EPA to recover 100% of its costs from non-settlors suggests that Congress also did not intend to diminish the *court's* power to award less than 100% of the claim." Rohm & Haas Supp. Brief at 13. (Emphasis in original.)

The problems with these assertions are numerous. Suffice to say that we are not persuaded that § 113(f)(2) is merely some congressionally mandated minimum benefit to non-settlors, upon which courts may improve as they

wish. Nor does § 113(f)(1) support this argument. That section by its own terms seems to apply only to those parties that are held liable; i.e., whose liability is adjudicated. 42 U.S.C. § 9613(f)(1), ("in resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.") Such an allocation is permissible among those responsible parties, but the calculus does not include a reduction of liability to account for the equitable share of the liability attributable to settling parties.

If Rohm & Haas's strained reading were followed, the United States would be forced to concern itself with the relative culpability of all PRPs, including those with which it settled. Otherwise, it might not obtain complete relief. If this were the case, the United States would save itself little in terms of litigation expenses and enforcement resources by settling with *de minimis* PRPs. This is, as we discuss above, a result at odds with Congress's clear intention to encourage such settlements.

■ The parties and the pre- and post-SARA case law are in agreement that before entering a consent decree under CERCLA, this court must satisfy itself that the proposed decree is fair, adequate and reasonable, and consistent with the Constitution and the mandate of Congress. *City of New York v. Exxon Corp.*, 697 F.Supp. 677, 692 (S.D.N.Y.1988); *see also Acushnet River*, 712 F.Supp. at 1028; *United States v. Conservation Chemical Co.*, 628 F.Supp. 391, 400 (W.D.Mo.1985); *United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334, 1337 (S.D.Ind.1982); *United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. 1067, 1072 (W.D.N.Y. 1982). This standard comports with the standard applicable within the Third Circuit to judicial approval of class actions, a standard which also requires the court to determine whether the proposed settlement is "fair, adequate and reasonable." *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir.1983); *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974).

The court's core concern in deciding whether to approve this proposed decree is with ensuring that the decree furthers the public interest as expressed in CERCLA. *Seymour Recycling Corp.*, 554 F.Supp. at 1337; H.R.Rep. No. 253, 99th Cong., 1st Sess. 19 (1985), U.S.Code Cong. & Admin. News 1986, p. 3042 ("Before initially approving a consent decree under CERCLA, a court must satisfy itself that the settlement is reasonable, fair and consistent with the purposes that CERCLA is intended to serve"). As this decree was negotiated pursuant to § 122 of CERCLA, we must measure the reasonableness of this decree against that section's purpose to "expedite effective remedial action and minimize litigation," while keeping a weather eye on the overall statutory constellation that is CERCLA.

■ A number of factors have been articulated as being potentially relevant to determining whether a CERCLA settlement is fair and reasonable, including: the strength of the Government's case, the good faith efforts of the negotiators, the possible risks of and transaction costs involved in litigation under CERCLA, and the effect of the proposed settlement on non-settling parties. *See, e.g., City of New York*, 697 F.Supp. at 692; *Conservation Chemical Co.*, 628 F.Supp. at 401–402; *Hooker Chemicals & Plastics Corp.*, 540 F.Supp. at 1072. Additional and similar factors utilized in the class action context which seem helpful include: "the complexity, expense and likely duration of the litigation," "the risks of establishing liability," "the ability of the defendant to withstand a greater judgment," and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation...." *Girsh*, 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 453 (2d Cir. 1974)).

■ In considering whether to accept a consent decree in light of these factors, courts have regularly followed *Grinnell*'s admonition that a court:

must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.

*Grinnell*, 495 F.2d at 462, quoted in *Hooker Chemicals & Plastics Corp.*, 540 F.Supp. at 1072; *Conservation Chemical Co.*, 628 F.Supp. at 400; *Seymour Recycling Corp.*, 554 F.Supp. at 1337–38. At the same time, however, we are urged not to substitute our own judgment for that of the parties. *Conservation Chemical Corp.*, 628 F.Supp. at 400 (quoting *Seymour Recycling Corp.*, 554 F.Supp. at 1338). Our task is not to make a finding of fact as to whether the settlement figure is exactly proportionate to the share of liability appropriately attributed to the settling parties; rather, it is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litiga-

tion and CERCLA's specific preference for such resolutions. *Acushnet River*, 712 F.Supp. at 1032; *cf. Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77, 80 (3d Cir.1982) ("Voluntary settlement of civil controversies is in high judicial favor ..."). Indeed, where a settlement is the product of informed, arms-length bargaining by the EPA, an agency with the technical expertise and the statutory mandate to enforce the nation's environmental protection laws, in conjunction with the Department of Justice, one court has indicated that a presumption of validity attaches to that agreement. *City of New York*, 697 F.Supp. at 692; *accord, United States v. Texas Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir.1982).

Applying the foregoing criteria to this proposed *de minimis* decree requires us to focus on two independent questions. First,

does a different standard of review apply to the determination of the United States that these settling defendants are eligible for a *de minimis* settlement under the criteria set forth in § 122(g)? Second, assuming that these settling parties are appropriate candidates for a *de minimis* settlement, what sort of scrutiny does our inquiry into the reasonableness of this settlement precisely require? We turn to the first question now.

## A. Satisfaction of the De Minimis Criteria Set Forth in CERCLA

Section 122(g), 42 U.S.C. § 9622(g), clearly evinces a congressional preference for the speedy settlement of cost recovery actions brought against parties meeting certain criteria.[15] The President, by way of

---

15. Section 122(g), 42 U.S.C. § 9622(g), provides:

(g) *De minimis* settlements. (1) Expedited final settlement. Whenever practicable and in the public interest, as determined by the President, the President shall as promptly as possible reach a final settlement with a potentially responsible party in an administrative or civil action under section 106 or 107 [42 USCS § 9606 or 9607] if such settlement involves only a minor portion of the response costs at the facility concerned and, in the judgment of the President, the conditions in either of the following subparagraph (A) or (B) are met:

(A) Both of the following are minimal in comparison to other hazardous substances at the facility:

(i) The amount of the hazardous substances contributed by that party to the facility.

(ii) The toxic or other hazardous effects of the substances contributed by that party to the facility.

(B) The potentially responsible party—

(i) is the owner of the real property on or in which the facility is located;

(ii) did not conduct or permit the generation, transportation, storage, treatment, or disposal of any hazardous substance at the facility; and

(iii) did not contribute to the release or threat of release of a hazardous substance at the facility through any action or omission. This subparagraph (B) does not apply if the potentially responsible party purchased the real property with actual or constructive knowledge that the property was used for the generation, transportation, storage, treatment, or disposal of any hazardous substance.

(2) Covenant not to sue. The President may provide a covenant not to sue with respect to the facility concerned to any party

who has entered into a settlement under this subsection unless such a covenant would be inconsistent with the public interest as determined under subsection (f).

(3) Expedited agreement. The President shall reach any such settlement or grant any such covenant not to sue as soon as possible after the President has available the information necessary to reach such a settlement or grant such a covenant.

(4) Consent decree or administrative order. A settlement under this subsection shall be entered as a consent decree or embodied in an administrative order setting forth the terms of the settlement. In the case of any facility where the total response costs exceed $500,000 (excluding interest), if the settlement is embodied as an administrative order, the order may be issued only with the prior written approval of the Attorney General. If the Attorney General or his designee has not approved or disapproved the order within 30 days of this referral, the order shall be deemed to be approved unless the Attorney General and the Administrator have agreed to extend the time. The district court for the district in which the release or threatened release occurs may enforce any such administrative order.

(5) Effect of agreement. A party who has resolved its liability to the United States under this subsection shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially responsible parties unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

(6) Settlements with other potentially responsible parties. Nothing in this subsection shall be construed to affect the authority of

EPA, *shall,* whenever practicable and in the public interest, *as promptly as possible,* reach a final settlement with a defendant if the settlement involves a minor portion of the response costs at the facility and, in the President's judgment:

(1) the amount of hazardous substances contributed by the settling party is minimal in comparison to the other hazardous substances at the facility (minimal volumetric contribution); and

(2) the toxic or other hazardous effects of the substances contributed by the settling party is minimal in comparison to the other substances at the facility (minimal toxicity).

42 U.S.C. §§ 9622(g)(1)(A)(i), (ii).

The United States & Rohm and Haas initially addressed the question of whether the defendant settlors met these statutory requirements as if this were the most important issue before the court. The United States urged upon us the notion that the court's only duty was to ascertain that the EPA "made a 'good faith' inquiry in determining that each *de minimis* defendant met the three criteria specified in section 122(g)(1)(A)." U.S. Reply Brief at 6. According to the Government, once we are convinced that EPA made such an inquiry, our task ends. *Id.*[16] Rohm & Haas, meanwhile, did not contend that the EPA's determination that each settlor qualified for a *de minimis* settlement should be substantively reviewed under the arbitrary and capricious standard of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). Instead, Rohm & Haas argued that this question should somehow be subsumed in the court's overall analysis of the fairness, adequacy and reasonableness of the proposed consent decree.[17] These contending

the President to reach settlements with other potentially responsible parties under this Act.

**16.** In a later submission, the United States more fully described this good faith test. It insists that the application of this test is straight-forward:

First, the Court should review the agency's identification of information that it gathered and considered in reaching its judgment in order to satisfy itself that EPA accumulated a sufficient database upon which to address each of the criteria set forth at 42 U.S.C. 9622(g)(1).... Second, the Court should determine that EPA has provided the Court with an explanation of how the agency analyzed its database, that the agency's analysis addressed each of the relevant statutory criteria, and that its analysis makes a *prima facie* showing that the parties qualify for *de minimis* treatment.... Lastly, the Court should review any comments submitted during the public comment period, and responded to by the United States, to determine if, in light of those comments and the Government's response, the agency's judgment that the parties qualified for a *de minimis* is clearly erroneous.... In the final analysis, EPA's determination to accord *de minimis* status to PRP is committed to agency discretion and is clearly subordinate to EPA's judgment to enter the specific consent agreement that it lodges with a court, be it *de minimis* or otherwise.

U.S. Supp. Brief at 16–18.

**17.** In a supplemental brief, Rohm & Haas argues that:

the determination of *de minimis* status does not have the "earmarks" of "agency action" as described in the Administrative Procedure Act ("APA"). In practice, EPA makes no separate determination of *de minimis* status other than the prosecutorial decision to enter the decree itself, and EPA certainly undertakes no proceeding of any sort at the agency level to examine the Subsection (g)(1) conditions. No separate notice or comment period is provided with respect to a determination of *de minimis* status, no hearing or other adjudicatory process is held, and there is no order or rulemaking that results from any agency deliberation. In short, the determination of *de minimis* status is part and parcel of the prosecutorial decision that is made to enter into a consent decree or administrative order under Section 122(g). Accordingly, the court should not apply any separate standards of review (e.g., the "arbitrary and capricious standard") to the *de minimis* determination.

Rohm & Haas Supp. Brief at 4.

Rohm & Haas seems to do so, in part, because it believes that if a court applies an arbitrary and capricious standard to the question of whether the statutory criteria set forth in § 122(g)(1)(A) are met, that it would somehow also review the overall acceptability of the decree under that standard. Apparently, Rohm & Haas believes that the fair, adequate, and reasonable standard imposes a greater burden upon the proponent of a settlement than would be the case if the settlement would have to satisfy arbitrary and capricious review. Ironically, the United States seems anxious to avoid the application of APA review because of its supposed stringency:

"Determining whether a particular party satisfied each of the statutory criteria set forth at 42 U.S.C. 9622(g)(1) is usually decided in a context of imperfect information and most assuredly requires a level and scope of scientific expertise reserved to the EPA. A 'good-

positions somewhat puzzled the court. While we were comfortable reviewing the "fairness, adequacy, and reasonableness" of the decree's terms under that federal common law standard, we were less certain that such a standard was useful or appropriate in reviewing the question of whether parties are statutorily eligible for *de minimis* status. And, candidly, we had never heard of the "good-faith" standard of review advocated by the United States.

If a proposed decree was challenged on the basis that it included PRPs ineligible for *de minimis* status, the court would be required to review whether (1) the agency utilized some permissible interpretation of the statutory criteria set forth in § 122(g)(1)(A), and (2) whether the agency appropriately applied those criteria to the evidence relevant to the settling parties' *de minimis* status. Fairness, adequacy, and reasonableness seem to have little to do with such an inquiry. Moreover, while we are keenly aware that the compromise of litigation is certainly not the usual sort of agency action reviewed under the APA, i.e., it is not an adjudication, rulemaking or licensing decision, *see* 5 U.S.C. § 551(5), (7), (8), under § 122(g)(4), a *de minimis* settlement may be entered as a consent decree *or be embodied in an administrative order*, which may be enforced by a district court. 42 U.S.C. § 9622(g)(4). Such an order might constitute agency action under 5 U.S.C. § 551(13),[18] potentially reviewable in accordance with the standards set forth in 5 U.S.C. § 706(2)(A),[19] *see* 5 U.S.C. § 702, especially if the agency seeks to have the order enforced by a district court. Of course, only a party who was "adversely affected or aggrieved" by such an administrative settlement, 5 U.S.C. § 702, could seek review; however, the settlement does extinguish the otherwise legally available contribution rights of the non-settling PRPs against the settlors.

Of course, review could also be precluded to the extent that CERCLA precludes judicial review of the EPA's determination that parties are *de minimis* or commits that determination to agency discretion. 5 U.S.C. § 701(a)(1), (2). The Supreme Court has said with respect to these exceptions that:

> The former applies when Congress has expressed an intent to preclude judicial review. The latter applies in different circumstances; even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.

*Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

Whether these two exceptions are applicable to review of a § 122(g)(1)(A) determi-

---

faith' standard of review recognizes the circumstances in which a party's qualifications for *de minimis* treatment must be ascertained, and accords the EPA due deference in exercising its scientific and administrative expertise in reaching such judgments."
U.S. Supp. Brief at 16. Presumably, the United States believes an appropriately tailored arbitrary and capricious review would not serve the same purpose.

**18.** The statutory definition of agency action "includes the whole or a part of an agency rule, *order*, license, sanction, relief, or the equivalent or denial thereof, or failure to act...." 5 U.S.C. § 551(13). (Emphasis added.) Rohm & Haas believes that a court confronted with a proposed consent decree need not address whether a different standard of review might apply to a *de minimis* decree embodied in an administrative order which EPA seeks to have enforced by a district court, since by choosing the consent decree path the United States implicates the equitable powers of this court and therefore

subjects the decree to the federal common law standard.

The problem with this is that a settlement effected by administrative order *may be enforced by a district court*, an equally effective use of the court's powers. Thus, there remains the apparently anomalous possibility that two settlements, both approved by district courts in one form or another, were subjected to different standards of review.

**19.** 5 U.S.C. § 706(2)(A) provides that:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

nation by EPA is doubtful. Though the United States argues that this determination has been committed to agency discretion, it is doubtful whether § 122(g)(1)(A) provides a court with no law to apply, *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410–413, 91 S.Ct. 814, 820–822, 28 L.Ed.2d 136 (1971), i.e., with "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. at 830, 105 S.Ct. at 1655; *but see United States v. Cannons Engineering Corp.,* 720 F.Supp. 1027, 1044 (D.Mass., 1989). ("The definition of *de minimis* is left to the discretion of the President.") Further, it is unlikely that Congress precluded judicial review of this determination. Congress explicitly limited judicial review or dictated a specific standard of review of certain EPA actions under CERCLA. *See, e.g.,* 42 U.S.C. §§ 9613(h), 9622(e)(3). It did not do so in reference to the President's determination that parties meet the criteria set forth in 42 U.S.C. § 122(g)(1)(A). Indeed, the SARA Conference Report says with respect to § 122:

> Nothing in this section diminishes the responsibility of or precludes the court from reviewing the lodged consent decree to determine whether relevant requirements of the Act have been met and whether entry of the decree is in the public interest.

H.R.Rep. 99–962, 99th Cong., 2d Sess. at 252 (October 3, 1986). Of course, there are intuitively appealing reasons why this particular agency determination should be subject to a different standard of review than normal agency actions, since the *de minimis* determination is in large respect a matter of litigation strategy within the prosecutorial discretion of EPA and the Department of Justice.

We, however, need not resolve this interesting administrative law question. It has become clear that none of the parties, including those objecting to the settlement, are arguing that the parties to the settlement do not qualify as *de minimis* under § 122(g), nor do any of the parties urge review of this determination under the standards set forth in the APA.[20] Rather, the crux of our dispute is whether the settlement agreed to by these settlors and the Government is fair, adequate and reasonable.

No party has suggested that it was impermissible for EPA to interpret a "minimal" volumetric share as a contribution of less than 1 percent of the hazardous waste at Lipari. *See Chevron v. N.R.D.C.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[21] In fact, Manor Health Care, as we shall see, feels this standard is unduly restrictive.

■ Nor has EPA's determination that these particular parties are *de minimis* been challenged. As will be shown, EPA's determination that these ten settlors contributed no more than 4.23 percent is based on its reading of the factual evidence available to it, evidence which no party has suggested is insufficient for purposes of the § 122(g) settlement process. The EPA has explained how it reached the conclusions it did based on this evidence. Its reading and application of this evidence is rational and there has been no clear error of judgment; moreover, the EPA considered and addressed the comments sent to it after the decree was published in the Federal Register. Finally, even Rohm and Haas estimates these ten settlors shares to be, generally, only slightly over 10 percent of the total waste at Lipari. In sum, based on our review of the record cited us by the parties, there would be no basis, if the APA applied, to hold that the EPA's deter-

**20.** *See* Rohm and Haas Supp. Brief at 2: "... Rohm and Haas does not contend that the proposed settlors should not be allowed to participate in *any de minimis* settlement under section 122(g). Rather, Rohm and Haas contends that the *terms* of the decree are unfair, unreasonable, and contrary to the interests of the public and the non-settlors...." (Emphasis in

original.) Manor Health argues that not only are these settlors *de minimis,* but that it is too.

**21.** And despite raising questions about this point, Manor Health has not produced evidence indicating that EPA's determination that the settlor's waste was not disproportionately toxic in comparison to other wastes at Lipari was a clear error in judgment or otherwise improper.

mination that these parties are eligible for *de minimis* treatment is arbitrary and capricious or a clear error in judgment. *See Natural Resources Defense Council v. U.S.E.P.A.*, 790 F.2d 289, 296 (3d Cir. 1986).[22]

### B. *Fairness, Adequacy, and Reasonableness*

Having considered the statutory criteria in § 122(g), we must now assess the fairness, adequacy, and reasonableness of this settlement. This, in our view, involves an important, but quite limited, inquiry.

We need not determine if the settlement precisely reflects what we feel to be the settlors' most likely volumetric share of the waste dumped at Lipari. Such a finding would be akin to that made at trial and would involve no savings in terms of judicial or enforcement resources.[23] If a settlement were required to meet some judicially imposed platonic ideal, then, of course, the settlement would constitute not a compromise by the parties but judicial fiat. Respect for the litigants, especially the United States, requires the court to play a much more constrained role. In the context of this particular dispute, it is how

we treat the settlement figure's relationship to the proportion of settlors' waste at Lipari which is the most important aspect of our review.

Rohm & Haas, it seems, wishes the court to consider this settlement unreasonable if the dollar figure set forth therein is not closely approximate, as a percentage, to this court's view of the most reasonable volumetric share attributable to the settling parties. That is, if we are persuaded that it is more likely that Rohm & Haas, as opposed to the United States, is correct about the settlors' volumetric contribution, then we should set aside the settlement. If, as Rohm & Haas contends, these parties contributed over 10 percent of the waste, then allowing them to settle for 4.4 percent of the projected response costs is unreasonable.

■ We, frankly, do not share this conception of our task. Ours is not, at this stage, a factfinding mission. It is rather an assignment to ensure that this is a reasonable compromise of this litigation. For this settlement to be reasonable, it need not be bottomed on the most convincing analysis of the present factual record, it must merely be reasonable when mea-

---

**22.** *Natural Resources Defense Council*, 790 F.2d at 297–98, quotes a Supreme Court articulation of the arbitrary and capricious standard which demonstrates the striking similarity between it and the good-faith standard advocated by the United States:

> The scope of review under the arbitrary and capricious standard is narrow, and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a rea-

soned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

> *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–2867, 77 L.Ed.2d 443 (1983). (Citations and quotations omitted.)

It may be that the good-faith standard is an attempt to adapt the arbitrary and capricious standard to the context of the CERCLA *de minimis* settlement process, in which EPA is encouraged to act expeditiously and on less than perfect information.

**23.** As the United States Court of Appeals for the D.C. Circuit has noted:

> [I]t is precisely the desire to avoid a protracted examination of the parties' legal rights which underlies consent decrees. Not only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation. Thus [v]oluntary settlement of civil controversies is in high judicial favor. *Citizens For A Better Environment v. Gorsuch*, 718 F.2d 1117, 1126 (D.C.Cir.1983) (quotations omitted).

sured by the range of plausible interpretations of that record. Compromise of litigation occurs precisely because there is uncertainty about the underlying factual circumstances and the range of possible recoveries. If a settlement is reasonable in light of those circumstances, it ought to be approved. On the other hand, if a settlement is based on a clear error of judgment, like a serious mathematical error, it may be appropriate to disapprove it because there is a likelihood that it is not a compromise intelligently entered into by the parties. But when a settlement is based on a plausible interpretation of the record evidence, and there has been no clear error of judgment, we do not believe that it is appropriate for the court to substitute its judgment for that of the statutorily appointed representatives of the public interest—the EPA and the Department of Justice.

Rohm & Haas insists that the court must delve more searchingly into the facts since it is, as we have discussed, Rohm & Haas and the other non-settlors, rather than the plaintiffs, who bear the risk that this is a bad settlement.[24]

Given this situation, Rohm & Haas urges us to use our equitable powers to disapprove this consent decree if it is likely to be unfair to a non-settling party. Only the court, after all, is in a position to ensure that the settlement is adequate since none of the settlors, including the plaintiffs, have the incentive to do so, and the non-settlors have no power to affect its terms.

Unfortunately for Rohm & Haas, CERCLA, as we read it, is not a legislative scheme which places a high priority on fairness to generators of hazardous waste. Obviously, EPA cannot comply with § 122(g)'s command to "as promptly as possible reach a final settlement" with *de minimis* PRPs if such settlements are going to be accompanied by an evidentiary review as careful as a trial on the merits. 42 U.S.C. § 9622(g)(1). Subsections one and three of section 122 are headed by the phrases "Expedited final settlement" and "Expedited agreement," respectively. 42 U.S.C. §§ 9622(g)(1), (3). Such expedition is at odds with the scientific congruity between a *de minimis* settlor's equitable share of the liability and the settlement amount that Rohm and Haas urges. And if Rohm and Haas is arguing that a *de minimis* settlement should only receive approval if it is for a dollar figure at the high end of a settlor's potential equitable share of the liability, then it has a much different view of what is meant by the term "voluntary *compromise* of litigation" than does this court.

Moreover, it is inconceivable that Congress, wishing to provide EPA with the statutory tools to make the most efficient use of its enforcement resources, would urge EPA to reach speedy settlements with *de minimis* parties but then require such settlements to be subject to *de maximis* judicial review. Courts have consistently held that lengthy evidentiary hearings are not required under CERCLA when a court is merely deciding whether a non-*de minimis* monetary settlement is fair, adequate and reasonable. *Acushnet River,* 712 F.Supp. at 1031, n. 21 ("to grant inevitably lengthy hearings in cases such as this would either frustrate the express intent of Congress to encourage settlement or negate the benefits of any settlement that resulted"); *United States v. Laskin,* 1989 U.S.Dist. LEXIS 4900, at 30 (February 27, 1989, N.D.Ohio) ("We do not believe that the public's interest in how cleanup costs are apportioned among the private parties is sufficient to justify an extensive hearing"); *City of New York,* 697 F.Supp. at 691 ("section 122 [of CERCLA] strongly

---

**24.** In fact, in the context of a federal securities class action, a proportional reduction mechanism has been found to be preferable to a *pro tanto,* i.e., amount of the settlement, reduction in part precisely because it obviates the need for a court to evaluate the fairness of a settlement to non-settlors by placing the risk of a bad settlement on the plaintiff class. *See In re Sunrise Securities Litigation,* 698 F.Supp. 1256 (E.D. Pa.1988). Indeed, this court has indicated its view that a proportional judgment reduction mechanism is to be applied as a matter of federal common law in securities cases, and that such a rule is preferable to a *pro tanto* rule on fairness grounds. *See In re National Smelting Bondholders' Litigation,* 722 F.Supp. 152 (D.N.J. 1989).

supports the view that settlements involving monetary payments only are to be reviewed with lesser stringency than those involving response action ... [and] [t]ellingly, section 122 contains no requirement that proposed money settlements be reviewed via an evidentiary hearing ..."); *United States v. Thomas Solvent Co.*, 717 F.Supp. 507, 519 (W.D.Mich.1989), ("I see no reason to subvert the very purpose of this settlement agreement, which is to avoid the costs of extended litigation, by ordering a hearing on whether the settlement represents the percentage of responsibility that would be adjudicated against [the settlor] if this case were tried").

 In this case, Rohm & Haas does not urge us to hold an evidentiary hearing, it merely asks us to review the paper record (cashbooks, receipts, depositions, etc.) and determine whether its view of that evidence is more plausible than that of the United States. But even this we will not do. It may be that there are certain circumstances in which a *de minimis* settlement is so grossly inadequate that the blatant unfairness to the non-settling parties and the rough requirements of justice would cause a court to hesitate before entering such a decree. But where a money settlement is shown to bear a reasonable relation to some plausible estimate, or range of estimates, of the settling parties' volumetric contribution, CERCLA requires that such a settlement be accepted and entered as a consent decree. Any unfairness to a non-settlor such as Rohm & Haas is a by-product of the congressional scheme, about which a court may do nothing in the absence of harm rising to a constitutional level.

Bearing these thoughts in mind, we now delve into the factual record. Following our review of this evidence, we will evaluate the reasonableness of the decree in light of the following factors: (1) the relative costs and benefits of litigating this case under CERCLA; (2) the strength of the plaintiff's case against the *de minimis* defendants, i.e., the risks of establishing liability on the part of the settlors; (3) the good faith efforts and adversarial relationship of the negotiators who crafted the settlement; (4) the reasonableness of the settlement as compared to the settlor's potential volumetric contribution; (5) the ability of the settlors to withstand a greater judgment; and (6) finally, and most importantly, the effect of the settlement on the public interest as expressed in CERCLA. If the proposed decree is reasonable in light of these factors, we need not, based on our view of our role, separately consider the fairness of the decree to non-settling parties.

## VI. FACTUAL AND LEGAL ANALYSIS

### A. *Identity and Estimated Contribution of the Parties*

The United States estimates that a total of 55,782 55–gallon drums of waste, or approximately 3 million gallons, were trucked to and disposed of at the Landfill. Three separate haulers were involved: Owens–Illinois, Almo Tank and Maintenance Corp. ("Almo"), and Marvin Jonas.

Based upon the testimony of Lipari, landfill receipts and Owens–Illinois check stubs, the Government calculates that over a period from June 1958 to December 1969, Owens–Illinois hauled four drums of waste per week to the site. Thus, they are responsible, according to the United States, for 2208 drums, or approximately 4.0 percent of the total amount.

Almo delivered approximately 194,750 gallons of waste to the Landfill between November 1968 and February 1970, according to Government estimates based on Almo checks and check stubs and entries in Lipari's cashbooks. This amount is the equivalent of 3380 55–gallon drums, or approximately 6.1 percent of the total number of drums deposited at the Landfill. Almo customers included three entities which the Government contends are *de minimis* generators—CBS, Hercules and Owens–Corning.

Marvin Jonas was the major hauler to Lipari. In addition to Rohm & Haas, Jonas hauled the waste of over two dozen generators to Lipari, including seven which, again according to the Government, qualify as *de*

*minimis* parties—Triangle Publications, DuPont, Allied Paper, Glidden Co., Betz Laboratories, SPS Technologies and Gilbert–Spruance. Piecing together Lipari's cashbooks, his deposition testimony, and the deposition testimony of Jonas, the Government contends that between November 1967 and early February 1970, Jonas hauled at least one trailer load of waste, consisting of 80 55–gallon drums, *per day* to Lipari. This totaled 44,800 drums, but the Government felt it appropriate to revise this figure upward to reflect the fact that Jonas occasionally transported two loads of waste per day to the site. Originally, the United States estimated that an upward adjustment of 10,000 drums was necessary; however, closer scrutiny of the record evidence, most especially a note prepared by Lipari in January, 1974, led the Government to revise its estimate downward by some 4,606 drums, making Jonas's estimated contribution to the Landfill 50,194 drums, or approximately 90 percent of the total amount deposited.

At the August 9 hearing, counsel for Rohm & Haas demonstrated its disagreement with the Government's estimates of Jonas's share of waste dumped at the site by making a detailed presentation of three possible methods of computing Jonas's involvement with the Lipari Landfill. These estimates showed, according to Rohm & Haas, that Jonas contributed up to 52,097 drums to the site. While the Government, not surprisingly, attempted to punch holes into Rohm & Haas's methodologies, both sides seem to agree that the January 1974 Lipari note established the amount Jonas paid Lipari to dump Rohm & Haas's waste and, consequently, provides a good estimate of the total amount of Rohm and Haas's waste deposited at Lipari. The disagreement arises over what amount of *non*-Rohm & Haas waste was transported by Jonas to Lipari. The Government claims that at most 2332 drums, representing approximately 4.2 percent of the total amount deposited at the site, came from the non-Rohm & Haas customers of Jonas. Rohm & Haas, employing the varied methods

mentioned above, arrives at a figure as high as 8,097 drums, representing as much as 15 percent of the total number of drums, contributed by Jonas's non-Rohm & Haas customers.

We think that, for the most part, this is a battle being fought on the wrong field. While Rohm & Haas argues from these numbers that the *de minimis* parties to the consent decree may have contributed, collectively, up to 18 percent of the aggregate amount of waste at Lipari, they cannot escape the fact that Jonas's non-Rohm & Haas customers included at least three and up to six entities who are not parties to the consent decree. Therefore, absent evidence specifically linking the ten companies who are signatories to the decree to Lipari, the total amount of non-Rohm and Haas waste delivered to Lipari by Jonas and Almo is largely irrelevant. We thus must turn to an examination of the available record evidence tying these parties to the Landfill.

▉ The partial consent decree embraces ten PRPs, all of whom, as previously noted, are customers of either Almo or Jonas, and all of whom certify in the decree that they are responsible for no more than 1 percent of the total amount of waste dumped at the site. Of these ten, the volumetric share of only five—CBS, Triangle Publications, Inc., E.I. DuPont de Nemours & Co., Allied Paper, Inc., and the Glidden Company—is specifically challenged by Rohm & Haas. As we have noted above, Rohm & Haas's opposition to this settlement is bottomed upon its contention that the ten settlors in the aggregate contributed over 10 percent, and that these five settlors in particular each contributed more than 1 percent of the total volume of hazardous substances disposed of at Lipari. Therefore, the proposed decree, which allows *ten* PRPs to settle the Government's claims against them by paying only approximately 4.4 percent of the total remedial cost of the cleanup, is unreasonable and unfair to the non-settling parties.[25] Consistent with what we feel encompasses our

**25.** Rohm and Haas also complains that the settlors are not paying a large enough "premium," if they are paying a premium at all. A premium in this context means any payment above the

scope of review of this matter, *see* pp. 48–54 *supra,* we turn to an examination of the relative merit, based on the record, of the Government's calculation of the volumetric share of waste deposited at Lipari by each of these five entities, bearing in mind that we are not to pick and choose among plausible readings of the record evidence, but merely determine whether the Government's version is within the range of reasonableness and fairness.

settlors' volumetric share of the total past and projected response costs at the Landfill. The United States originally argued that the proposed decree contained a 26 percent premium; it now admits there is no real "premium."

Rohm and Haas says the absence of a premium is further evidence that the settlement is grossly inadequate. "The purpose of a premium is to hedge against an increase in clean-up costs after the settlors have been released from the case and also to offset the immediate benefit derived by the settlors from avoiding the risks and expenses of litigation." Rohm & Haas Brief at 51.

An industry study group described the rationale for the premium:

The central benefit obtained by any settling [*de minimis*] party is the discharge of liability for its share of the ultimate remedial costs. The basic objective, therefore, should be to match the base payment by the [*de minimis* settlor] as closely as possible to the best available estimate of [its] share of liability.

By discharging its liability early in the proceeding, the [*de minimis* settlor] achieves two objectives: first, it avoids future transaction costs. That, of course, is the basic point of the [*de minimis* settlement] concept. Second, the [settlor] achieves (or, depending on the terms of the settlement, may achieve) certainty in defining its liability long before the Superfund process has come to an end. Nearly all companies would place significant value on receiving such certainty in contrast to the alternative of remaining exposed to open-ended liability for an indefinite period of time.

Neither of these benefits is available to the PRPs who are ineligible to participate in a [*de minimis* settlement]. They must continue to incur transaction costs and must continue to live with undefined liability. Accordingly, in order to strike a fair balance among all PRPs, an appropriate premium should be charged as part of the settlement package, which represents the value of a [*de minimis*] PRP's transaction cost savings and early liability finality.

*Superfund Settlements With De Minimis Waste Contributors: An Analysis of Key Issues by the Superfund Settlements Project,* May 8, 1987, Vol. XIV Chem. Waste Lt.Rptr. 34, 42–43 (June 1987). The Study Group further points out that in other *de minimis* settlements the settlors have paid a premium, or a multiplier of 1.5, 1.6 and

*CBS*

The United States estimates that something less than one full load of CBS waste lies in the Lipari Landfill. CBS operated a major manufacturing facility in Pitman, New Jersey, for injection molding and plating of record dies. Waste products from these processes were shipped from the CBS plant by Almo. Between December 1968 and February 1970, Almo used the Lipari

up to 2.6 times their base volumetric share of the response costs. *Id.* at 52.

The United States concedes that the EPA often, because of the necessarily preliminary estimate of settlors' volumetric contribution and of total response costs, requires settlors to pay a premium or to include a reopener in the decree. But not only does EPA's determination to seek such protections hinge on case specific factors, *see Interim Guidance On Settlements With De Minimis Waste Contributors Under Section 122(g) of SARA,* 52 Fed.Reg. 2433 (June 30, 1987), the United States insists that Rohm & Haas has no basis to complain about the absence or inadequacy of a premium.

We agree. Though a generous premium may support the reasonableness of a proposed settlement, it is by no means a requisite to acceptance of such a settlement. A premium does protect non-settling defendants from possible unfairness, as would a reopener calculated to kick in at such time as response costs have increased so much that the settlors are no longer contributing a payment proportionate to their volumetric share. However, CERCLA itself contains no requirement that settling parties pay a premium or that a settlement contain reopeners. As a matter of practice, it may be EPA's intention to seek a premium when it can obtain one. But we see no imperative for it to do so. In fact, one court has indicated that it is the settling parties who "may well deserve a premium, at least in the view of the [Government], for being the first defendant[s] to settle, and for doing so well in advance of the trial of [their] portion of the case...." *Acushnet River,* 712 F.Supp. at 1032. Undoubtedly, the tremendous transactions costs and the possibility of joint and several liability for all response costs at a site which accompany litigating a CERCLA action through the liability stage already create a large settlement incentive for PRPs. But this does not mean that any CERCLA settlement must be conditioned upon a payment well in excess of the settlors' highest possible volumetric share. This would be an odd requirement indeed. Conditioning acceptance of a compromise upon a defendant's agreement to pay an amount commensurate with its potentially highest volumetric share *plus* a premium seems an ineffective and oxymoronic way to facilitate the voluntary resolution of litigation.

Landfill, along with at least three others— Fazzio's, Harris's and American Recovery. U.S. Ex. 30 at 55–56, 58, 63; U.S. Ex. 22 at 59.

CBS purchase orders and Almo invoices indicate that up to 25 loads of CBS waste were shipped by Almo during this period. *See* U.S. Brief at n. 21, pp. 28–29. However, these records provide little clue as to which landfill or landfills these loads were trucked. Rohm & Haas argues that since Lipari Landfill is located in an area of Mantua Township adjacent to Pitman, its geographic proximity suggests strongly that a good portion of the 25 loads of CBS waste ended up there.[26]

However, the United States points out that if Almo frequented Lipari to dispose of CBS waste, it was likely not behaving like a normal profit-maximizing business. CBS and Almo's records show that Almo charged CBS $25 a load to haul its waste, but Lipari cashbooks indicate that Almo had to pay the Landfill from $40 to $45 a load to deposit it there. *See* U.S. Exs. 27–29; 18 at 60–63. Rohm & Haas hypothesizes that Almo made up for this difference by charging CBS for other services, and that in view of the longstanding friendship between John and Joe Cucinotta, owners of Almo, and Nick Lipari, Almo "may not have been concerned about a small amount of loss received by giving some dumping business to Lipari in light of the substantial profit Almo derived from other services provided to CBS." Rohm & Haas Brief at 34.

Other than marshaling some Almo invoices which indicate that the company did charge CBS for "other services," Rohm & Haas produces nothing but interesting conjecture to undergird this theory. It is, this court supposes, *possible* that Almo did swallow dumping losses in the manner described by Rohm and Haas; it is just as likely, however, that all or most of CBS waste was hauled to Fazzio's landfill, which charged only $10 a load, or to some other site that charged less than Lipari. U.S. Ex. 22 at 65.[27]

As the documentary evidence of which waste was dumped where is inconclusive, both the United States & Rohm and Haas place heavy reliance on deposition testimony of the Cucinottas, Lipari, and several Almo truck drivers. This testimony is, for the most part, contradictory and confusing. For example, Nick Lipari testified that Joe Cucinotta arrived at the Landfill one time with a driver and a load of waste, and "they mentioned that some of [it] was coming from Columbia Records." Rohm & Haas Ex. 32 at 81. However, Joe Cucinotta denied that this encounter occurred, and neither he nor his brother recollect a single load of CBS waste being transported to Lipari. U.S. Ex. 22 at 145, 146, 58–60. Three Almo truck drivers, Bruce D. McLaughlin, William L. Durham, Jr. and James Fahy, all remembered shipping CBS waste *only* to other landfills and could not recall any driver transporting materials from this source to Lipari. U.S. Ex. 30 at 36–37; 55–56; 82. One truck driver, Silas Sottile, recounted at various times in his deposition that he took one, two, three or four loads of CBS waste to Lipari, and that several other drivers, including Durham and Fahy, told him about their transport of CBS products to the Landfill. In the same deposition and directly after this testimony, though, Sottile denied having conversations with any of these men. Not surprisingly, counsel for CBS has labelled Sottile's testimony "patently incredible, unreliable and self-defeating." CBS Brief at 14.

In view of the extreme paucity of hard data on the transportation of CBS waste, and the equivocation of the principal witnesses involved, it cannot be said with any assurance that any of CBS's wastes were ever taken to Lipari. Therefore, the United States estimation that something less

---

**26.** At least one Almo truck driver, however, claimed that the company never used Lipari Landfill, because "Fazzio was closer, Harris was closer, everybody else was closer" to Almo's facility than Lipari. Deposition of William L. Durham, Jr., U.S. Ex. 30 at 63.

**27.** This would be more consistent with the testimony Joe Cucinotta, who stated that he would charge his customers more for hauling their waste than he paid the Landfill for depositing it. U.S. Ex. 22 at 122.

than one full load, or about one-tenth of one percent of all drums found at the site, originated at CBS, is clearly within the range of reasonable readings of the record evidence. We accordingly do not find that the consent decree's characterization of CBS as a *de minimis* party is unreasonable, nor does its settlement contribution seem inadequate in light of the weak evidence linking it to Lipari.

### Triangle Publications

Rohm & Haas challenges Triangle Publications' certification in the proposed consent decree that the hazardous substances it contributed to the Lipari site do not amount to more than 1 percent of the total volume of wastes disposed of at the site. Rohm & Haas points out that Triangle's wastes from its printing presses—primarily excess ink and solvents—were hauled by Marvin Jonas, and Jonas has testified that he is "sure" that he trucked Triangle materials to Lipari. Rohm & Haas Ex. 51 at 85, 87–88. Rohm & Haas further contends, on the basis of Triangle purchase journals which show that it paid Jonas some $9,681.50 between 1967 and 1970, that between 1173 and 4700 drums were hauled from Triangle by Jonas. Rohm & Haas Brief at 36–37.[28]

What Rohm & Haas cannot show, however, is whether all, most, or substantially any of these drums were eventually transported to Lipari. Moreover, there is an abundant amount of evidence to indicate that many of the drums picked up by Jonas from Triangle were *empty*. David Cutler, the former rotogravure division plant manager at Triangle, and John Sheehan, his assistant, testified that Triangle consistently returned excess ink and solvent to its ink vendors and maintained a solvent and sludge recovery system that resulted in the recovery of from 85 to 98 percent of these wastes. Triangle and DuPont Exs. 2 at 10–20; 3 at 18; 1 at 30; 2 at 63. Thus, Cutler stated that the actual amount of non-recoverable waste requiring removal from the plant equalled at most only about 20 drums every six months; the bulk of the drums hauled away by Jonas, according to Cutler and Sheehan, were simply empty ink barrels. *Id.*, Ex. 2 at 20; Ex. 3 at 18; Ex. 5 at 38; Ex. 8 at 34.[29]

In light of the fact that little evidence exists linking any of Triangle's haulage to Lipari, and that substantial evidence is present to suggest that much of its "waste" consisted of empty drums, we cannot say that the consent decree's assignment of a $376,552 share of a $2,873,587 total settlement to Triangle is unreasonable or inadequate.

### E.I. DuPont De Nemours & Co.

DuPont's Philadelphia facility produced paint waste products consisting of organic and inorganic pigments, synthetic polymers and solvents. Rohm & Haas Ex. 56. From 1950 to 1975, DuPont contracted with Schiavo Brothers for the disposal of its drummed waste. Rohm & Haas points out that from 1967 through 1975, Schiavo subcontracted some of its haulage operations, including its DuPont account, to Marvin Jonas. Rohm & Haas Brief at 38. Rohm & Haas further points to certain deposition testimony of Jonas, in which he stated that he hauled latex materials, press papers or wash presses from DuPont and "indirectly ... or directly" deposited them at Lipari. *See* Rohm & Haas Ex. 58 at 87–88; Ex. 59 at 123. Combining this with an estimate that DuPont disgorged some 1300 tons of paint waste per year from its Philadelphia

---

**28.** These calculations are based on Rohm and Haas's estimate that Triangle paid Jonas anywhere between $5.00 per drum and $1.25 per drum during the relevant time period.

**29.** The sworn testimony of a driver for Jonas, David Bumbaugh, taken in a deposition in the case of *New Jersey DEP v. Gloucester Environmental Management Service, Inc.,* 668 F.Supp. 404 (D.N.J.1987, Brotman, J.), lends credence to the view that the majority of Triangle drums carted away by this hauler were empty. Bumbaugh testified that from the mid–1960's to 1973 he "hauled empty drums" for Jonas. *See* Triangle Reply Brief, Ex. 6 at 11. Specifically Bumbaugh stated that he was the only driver to service Triangle, *id.* at Ex. L, p. 136, and that he "didn't really pick up a lot of stuff there" because at each visit "they [Triangle] only had like two, three, four full drums and maybe 30, 40 empty." *Id.* at Ex. M, p. 134.

plant, and with Rohm & Haas's contention that for a 9– to 12–month period, Jonas hauled waste from his accounts solely to Lipari,[30] Rohm and Haas asserts that "If Jonas hauled even 1000 tons of DuPont waste to Lipari Landfill, DuPont's contribution would greatly exceed 1%." Rohm & Haas Mem. at 40.

The chief problem with Rohm & Haas's heavy reliance on Jonas is that his testimony, especially in regard to any DuPont–Lipari connection, is exceedingly equivocal. At his deposition in April, 1986, Jonas was asked to name companies whose waste he took to Lipari. He stated, "DuPont may have went out there because I was—I may have been hauling for Mr. Shiavo, DuPont drums in. I don't remember if they did or didn't." U.S. Ex. 12 at 86. He later identi-

fied the types of wastes he transported for DuPont, but added "this was 25 years ago," and, as for whether he took those wastes to Lipari, he couldn't be sure if he "took it there at all." *Id.* at 87. Still later in the deposition, Jonas testified that he shipped DuPont waste to Lipari when Schiavo "got in trouble." *Id.* at 124. But again, he added a qualification:

> Q. Okay. So that your testimony is that to the best of your recollection some DuPont waste was taken to Lipari?
>
> A. To the best of my recollection, but I would not sit on a stack of Bibles and swear to it.

*Id.* at 124.[31]

To the extent that such testimony goes at all towards establishing that DuPont

---

**30.** In their moving papers and at oral argument, Rohm and Haas placed great weight on Jonas's testimony that he used Lipari "exclusively" for up to one year. However, a close examination of the Jonas deposition reveals that such testimony, like most statements made by the hauler, must be considered somewhat limited in probative value. Early in the Jonas deposition, he is questioned by Assistant United States Attorney James Woods, and the following exchange occurs:

> Q. Going back to Nick Lipari's Landfill, do you have an idea how long you disposed of Rohm and Haas waste there?
> A. No, but—I may be way off but maybe a year, year-and-a-half. I may be way off on that.
> Q. How much would have been [sic] for those years?
> A. I can't answer that, I don't know.
> Q. Would it be—were you using Nick Lipari's Landfill exclusively at that time?
> A. No.
> Q. You were using other landfills?
> A. We were using it exclusively for a while. Then we got involved with Cramer at the same time. So we used both for a while.
> Q. Okay. And—
> A. If I remember correctly.

U.S. Ex. 12 at 76. Later, counsel for Owens–Illinois seizes on the exchange and asks:

> Q. You indicated earlier in answer to a question from Mr. Woods that for a period of time you dumped waste exclusively at Lipari, is that correct?
> A. That's correct.
> Q. Do you know for what percentage of time. Can you give me an estimate for how long a period of time you were doing it exclusively at Lipari?
> A. You're asking me to guess?

> Q. No, I don't want you to guess. Can you give me a reasonable estimate?
> A. That's a guess.
> Q. What would your guess be?
> A. My guess would be maybe nine months, a year, somewhere.
> Q. What do you base that guess on?
> A. Because we had gotten connected with Cramer Landfill which we were going to either one or both so we used them both, but we never stopped using Lipari's but the volume cut down a little. Cut down considerably let's say.

*Id.* at 154–55. It is clear from these extracts that any estimate Jonas made of his "exclusive" use of Lipari is weakened by the qualifying language used by the deponent himself. Further, it appears possible from the exchange between Jonas and counsel for Owens–Illinois that the hauler misunderstood the question or its import: he speaks of basing his "guess" that he used Lipari exclusively for a period of "maybe nine months, a year, somewhere," on the fact that his company used *both* Lipari and Cramer Landfills "but we never stopped using Lipari's...." In sum, Jonas's statements here provide a shaky foundation for Rohm & Haas to anchor its assumptions.

**31.** It is possible, as counsel for DuPont points out, that Jonas's apparently contradictory testimony may stem from the fact that after 1975, he began hauling DuPont's waste pursuant to direct contact, which lasted until 1979. In his deposition, Jonas explained that he first started hauling for Schiavo because Schiavo:

> had some problems on his landfill and couldn't receive any materials and to keep his customers he asked me to handle them and I knocked his brains out and done it for him because I didn't like the guy and I wanted the

waste was transported to Lipari, it appears to be unsupported by the documentary record. As the Government points out, none of the three DuPont internal memoranda cited by Rohm & Haas identified Lipari as the site of DuPont's waste disposal. In fact, an April 8, 1982, memo by R.A. Mead, DuPont's Environmental Protection Coordinator, states that "[d]uring the 1968–1972 period in question, all of the paint waste was transported from the site by Schiavo Brothers, Inc.... They disposed primarily at their own landfill at 72nd and Eastwick in Philadelphia. Although no documentation exists, employees recalled ... that Schiavo used some other landfills in and around Philadelphia. The only name that could be recalled is the Folcroft Landfill Corporation [in] Folcroft, PA...." Rohm & Haas Ex. 56; U.S. Ex. 44.

In short, there exists no hard evidence placing *any* of DuPont's waste at the Lipari site. Even accepting Jonas's qualified and somewhat elliptical testimony that he hauled DuPont materials during the relevant period he used Lipari, it cannot be established, on this record, that anything more than a *de minimis* amount made it to that site. Accordingly, we cannot say that DuPont's settlement share of $376,552 is at all an unfair or unreasonable compromise.

### Allied Paper, Inc.

Rohm & Haas contends that the Jonas deposition testimony establishes that Allied employed the hauler at a "steady" pace during the period of time that he used the Lipari Landfill. However, even Rohm and Haas must concede that Jonas testified that SCM Corporation, the predecessor to Allied, was a company whose waste he only may have hauled to Lipari. U.S. Ex. 12 at

88, 94–95. Indeed, Jonas admitted that any SCM/Allied waste he hauled during the relevant time period may well have gone to a different landfill, Kramer's. *Id.* at 129.

Allied purchase orders and checks indicate that Jonas hauled waste from Allied's Phoenixville, Pennsylvania facility from July 1969 to February 1970. Rohm and Haas Ex. 62. During this relatively brief period of time, these records establish that some 742 drums were taken away by Jonas. According to the Phoenixville plant superintendent, Andrew Conway, many of the drums removed by Jonas were empty. Allied Ex. Q at 42. Donald Toth, the plant's warehouse foreman, estimated that 90 percent of the Allied drums handled by Jonas were empty. Allied Ex. S at 30.

However, even if all the Allied drums taken by Jonas in 1969–1970 went to Lipari, and even if all these drums were filled with toxins, Rohm & Haas itself calculates that this would mean that Allied had contributed 1.2 percent of the total amount of wastes deposited at Lipari. Rohm & Haas Brief at 41. Thus, at worst, the Government's estimate of Allied's relative share is off by two-tenths of 1 percent. Clearly, the assignment of Allied as a *de minimis* party falls within the range of reasonableness and should be accepted.

### Glidden Company

Rohm & Haas argues that Glidden "cannot *certify* that it contributed less than a 1% share" of the total volumetric amount of waste deposited at Lipari, chiefly because Jonas testified that Glidden was a "good account," and that Jonas's ledger books indicate that he made weekly hauls from Glidden in 1970. Rohm & Haas Brief at 43 (emphasis in original); U.S. Ex. 12 at 138; Rohm & Haas Ex. 63.[32] However,

---

drums and he eventually got his problem straightened out and took it back himself. Q. And that was how the DuPont accounts came to you?
A. It didn't come to me. It came to me years later when the second Schiavo got in trouble. They come looking for me at that point, DuPont.
U.S. Ex. 12 at 163. If Jonas's reference to DuPont coming to him "years later" means when his direct contact started in 1975, then this

would suggest that his haulage of DuPont materials took place after he ceased using the Lipari Landfill. This could explain his equivocal and confusing testimony regarding the DuPont–Lipari nexus.

**32.** In light of the dearth of documentary proof and the demonstrated opacity of much of the record evidence that exists in this case, we must too express at least a note of skepticism that any party to this litigation could possess confidence

there is nothing, other than a somewhat confusing reference by Jonas, to indicate that these wastes from the company's Reading, Pennsylvania paint plant eventually found their way to Lipari. When the Glidden firm was mentioned during Jonas's deposition testimony the following exchange occurred:

A. That was a good account in Reading, Pennsylvania, paint manufacturer.

Q. Did you haul waste for them?

A. Yes, weekly.

Q. Did you haul to Lipari?

A. Yes, I'm sure I did that stuff, yes. That was an early-on customer. There again, we get back to I was hauling and somebody else was hauling them and bringing them to me so in 1970 they may not show on my ledger card but I was handling them. Eventually I took the accounts over on my own.

Q. They became your customer?

A. Yes. But I was hauling them before they were my customer.

U.S. Ex. 12 at 138. From this, and from the before mentioned ledger books, Rohm & Haas extrapolates that Glidden could be responsible for as many as 8,000 drums at the site. However, as the above testimony suggests, Glidden apparently came to Jonas in the same fashion that DuPont did—as an original customer of the Schiavo Brothers whose account he eventually took over. Much of the waste from these accounts was hauled to the Schiavo's own landfill in Philadelphia or to other sites in the area. *See* Rohm & Haas Ex. 56; U.S. Ex. 44.

Moreover, to the extent that Jonas's ledger books show sustained hauling from Glidden in 1970, it is relevant to note that Lipari cashbooks indicate that Jonas ceased using Lipari early in February of that year.

U.S. Ex. 14. Even if we accept these ledger books as evidence of a pattern and practice of weekly hauling and dumping of Glidden waste by Jonas extending back to 1968 and 1969,[33] the court is still required to assume that Jonas hauled all this waste to Lipari, in spite of evidence that other sites were used by Jonas during this era.

In short, there are just too many layers of thinly supported assumptions in Rohm & Haas's argument regarding Glidden for this court to accept it as a basis for disturbing the settlement. The dollar figure exacted by the United States in its settlement with Glidden is easily within the ambit of reasonableness, when measured against such evidence.

### B. Consideration of Relevant Factors

Based on the foregoing legal and factual recitation, all that remains is to evaluate the proposed decree in light of the factors we previously set forth. First, it is clear that the settlement with these ten entities will greatly curb the transaction costs of what already promises to be a drawn out and expensive trial. This, given the limited capabilities of the public fisc to provide enforcement and judicial resources, is surely a desirable result. On the other hand, disapproval of the settlement would require the Government to engage in a long litigative expedition against these parties, with the promise of no absolute benefit, as there already exist in this case defendants which could be found jointly and severally liable for the entire remaining amount of the response costs.

Second, our preceding discussion of the facts demonstrates that the risks to the Government of litigating the liability of the *de minimis* settlors would be substantial. For all of Rohm & Haas's artful marshalling of the evidence in their briefs and at

---

to "certify" what their volumetric share was, or even what it did not exceed. However, the issue before us does not require that we pass on the ultimate veracity of these certifications. Rather, we must only assess whether the Government's estimation of the *de minimis* settlors' respective shares falls within the range of possibilities such that the consent decree is reasonable and fair.

**33.** Leonard Luce, former Glidden receiving and hauling superior at the Reading plant and the individual responsible for waste disposal, testified to hearing "rumors" that Jonas sold Glidden paint wastes to third parties instead of disposing of it. Glidden Ex. P at 17.

oral argument, it is inescapable that the links between the *de minimis* generators and Lipari are tenuous at best, forged by a scanty and incomplete documentary record and the obtuse recollections of witnesses whose credibility and reliability must, in some cases, be sharply questioned. With a large number of parties and concomitant paltry arsenal of factual proofs to throw against them, settlement appears to be the most fruitful and responsible course.[34]

Third, we are convinced that the proposed decree is the product of arm's-length and adversarial bargaining, while acknowledging that the judgment reduction mechanism utilized by CERCLA minimized the risks borne by the government during the settlement process. The settlement was some three years in the making, and grew out of an extensive discovery process (in which Rohm & Haas admittedly played a lead role) to identify *de minimis* PRPs and attempt to calculate their volumetric share. Along the way, there was much jockeying for position and advantage by the government and the parties: initial offers by the Government in October of 1986, counter-offers made by the parties, and roundly rejected, counter-offers proposed again, rejected again, and finally accepted (in some cases) only when they approximated the Government's original terms. Rohm & Haas argues that the fact that nine out of ten of the *de minimis* parties were not named as defendants in this case until Rohm & Haas "went after them" demonstrates a certain lack of zeal on the part of the United States vis-a-vis these entities. We are persuaded, however, that the Government's use of Rohm and Haas's obvious interest in ferreting out other PRPs and establishing their liability to drive the discovery process was both responsible and, in the best sense of the word, calculating, in an era of tightened budgets for agency enforcement.

Fourth, our previous factual discussion further highlights the reasonableness of the settlement as compared to the settlors' potential volumetric contribution. It is possible that the evidence could be construed to show that some of the potential settlors may have contributed more than 1% of the total amount of waste dumped at Lipari and it is quite possible that the percentage of the waste accounted for by Almo, Rohm and Haas and Jonas customers is closer to Rohm and Haas' estimates than it is to the Government's. Given the current state of the record, however, it is just as likely (and in some cases more probable) that those particular settlors' shares ranged closer to the government's *de minimis* estimates. We do not, of course, intimate that the Government's calculations are *correct*, but neither can we say that they do not comprise a reasonable compromise of the litigation.

We stress that our analysis necessarily is based on the "current state of the record" and we note with approval that the Decree's reopener provisions include a clause which would allow further action against a *de minimis* settlor if *new evidence* is uncovered which indicates a greater than 1% involvement, a provision which operates to protect the interests of the non-settlors.

In addition, the $94 million reopener, while not guaranteeing that the settlors would pay their proportionate share of a $94 million clean-up, does, at the very least, place an upward limit on this disproportionality. Of course, if the settlors' own view of their volumetric share is accurate, the settlement figure could still bear a proportionate relation to their volumetric share even at $94 Million.

Fifth, as for the ability of the settlors to withstand a greater judgment, we do not think this factor has much presence here, as corporate giants such as CBS and DuPont would hardly be shattered by being forced to pay out a larger share of the response costs. Nor, however, does the release of these settlors leave only judgment proof PRPs left to account for the remainder of the response costs. Rather,

---

**34.** Indeed, in opposing the settlement Rohm and Haas has largely ignored the possibility that some of these settlors could be found not liable. If such an eventuality occurred, of course, the non-settlors would possibly be in a much worse position than if the settlement had been approved.

most of the remaining defendants seem, if one gets any idea from the Wall Street Journal, capable of satisfying any judgment. We also note that counsel for Gilbert Spruance admitted candidly at oral argument that the company had recently lost its insurance coverage and that although the monies it had earlier earmarked for the settlement were not presently threatened, if the settlement were disapproved this money may well become unavailable, not to mention the fact that the company might be judgment proof for a greater sum.

Finally, we think the settlement is plainly within the public interest, as defined by CERCLA. CERCLA's enactment was motivated chiefly by two policy concerns:

First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986) (quoting *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112 (D.Minn.1982)). This settlement furthers these interests in several ways.

First, while it is true that Congress has created the Hazardous Substance Trust Fund, more commonly known as the "Superfund," to help EPA redress the health and environmental threat posed by the release of hazardous substances, *see* 26 U.S.C. § 9507, 42 U.S.C. §§ 9604, 9611, Congress was aware when it enacted CERCLA that the Superfund provided only a limited source of fiscal resources to be used to protect and restore the nation's environment and that the cost of necessary response activities would greatly exceed the capacity of the fund. See S.Rep. No. 848, 96th Cong., 2d Sess. at 17–18 (1979).

Approval of this settlement will bring over $2.5 million into the coffers of the Superfund and provide $500,000 to the State of New Jersey to aid its efforts to protect the public health and the environment. This money will come from the pockets of hazardous waste generators, thus fulfilling, at least to an extent, CERCLA's intention to impose the costs of response activities on those parties most responsible for causing the problem. At the same time, the decree serves to mitigate the impact of joint and several liability upon *de minimis* contributors.

Most important, the settlement will ease the strain on public enforcement resources and this court. The settlement will remove ten small-volume contributors from the litigation, streamline the trial and contribution stages of this case, and substantially reduce associated transaction costs—a result which fully accords with the purpose for which § 122(g) was enacted. The court envisions that this diminution in parties and issues will allow both the parties and it to move expeditiously to resolve this litigation, and allow the Government to focus its enforcement resources on the major contributors to the problem at Lipari.[35]

In sum, consideration of these factors in light of the record before us favors judicial approval of the proposed consent decree. The decree by no means embodies an ideal settlement. There is a real risk that the dollar figure is disproportionate to the volumetric share of the settlors, and thereby, of significant prejudice to the non-settling defendants. At the same time, however, the settlement is a reasonable and fair *compromise*. There remains, after much discovery, much uncertainty as to the volumetric share and, indeed, the liability of some of these settlors. The volumetric share and concomitant dollar sum which underlie this settlement do, it seems to us, reside comfortably within the plausible parameters of those settlors' potential equitable liability, be it high or low.

Perhaps the settlement could better serve the interests of justice, and certainly

---

**35.** Total CERCLA litigation costs have been projected to run in the *billions of dollars*. *See* Note, Developments—Toxic Waste Litigation, 99 Harv.L.R. 1458, 1479 n. 73 (1986).

of the non-settling PRPs, if the dollar figure were higher or it contained more protective reopeners. But the question is not whether this is a perfect settlement but whether it is one which is fair, adequate, and reasonable, and within the reaches of the public interest. We believe that the proposed decree constitutes such a settlement, and we will accept it.

## VII. MANOR HEALTH CARE'S MOTION FOR INJUNCTIVE RELIEF

The last item we must consider is the rather unusual argument presented by defendant Manor Health Care in support of its motion to enjoin entry of the proposed decree.

As mentioned earlier, Manor Health Care ("Manor Health") is a successor corporation to Almo and has allegedly succeeded to Almo's potential liability for response costs incurred at Lipari. Almo, as we know, transported waste to Lipari and the United States contends that Nick Lipari's cashbooks and corresponding Almo checks, *see* Government Exhibit 19, reflect payments from Almo for 3380 drums of waste, some part of which was hazardous, to Lipari. This amount constitutes, potentially, approximately 6.1% of the total hazardous waste allegedly dumped at the landfill.

The source of Manor Health's opposition to the proposed decree derives from the fact that three of the *de minimis* settlors are CBS Records, Hercules and Owens–Corning. These companies were customers of Almo and any waste of theirs which was

dumped at Lipari is alleged to have been transported by Almo.

The United States now contends that these settlors' waste each accounts for only a *de minimis* share of the waste at Lipari, and that Almo, based on Lipari's cashbooks, thus transported a large amount of waste to Lipari which was not generated by CBS, Hercules ,or Owens–Corning.[36] Since Manor Health's share of the waste, via Almo, is alleged to be 6.1%, the United States could not, based on the present evidence, accord Manor Health *de minimis* status. Until further discovery is completed, argues the United States, it cannot determine if the overage, i.e., the waste transported by Almo to Lipari in excess of that generated by CBS, Hercules and Owens–Corning, was hazardous waste within the meaning of CERCLA.

Manor Health contends that the administrative record, and the United States previous reading thereof, supports the view that all the hazardous wastes it transported to Lipari were generated by CBS, Hercules and Owens–Corning. Any excess was sewage or petroleum and thus not hazardous substances within the definition set forth in CERCLA. 42 U.S.C. §§ 9601(14), 14(C); 40 C.F.R. ¶ 261. Since it is only linked to hazardous waste dumped at Lipari by its connection to three of the *de minimis* settlors, it is, therefore, says Manor Health, arbitrary and capricious for the EPA to refuse to accord it *de minimis* status and allow it to participate in the settlement.[37]

Now, Manor Health finds EPA attributing forty-one 4500 gallon loads to Almo, only a portion of which EPA links to the three *de minimis* settlors. This new attribution, is according to Manor Health based on a tortured reading of the record, purposely designed to minimize the volumetric contribution of CBS, Hercules and Owens–Corning in comparison to Almo.

The problems with this assertion by Manor Health are too manifold to be completely set forth. That EPA equated Almo's responsibility solely with its three *de minimis* customers does not emerge clearly from the portions of the record cited by Manor Health. Most important, however, is the fact that Almo payments to Lipari for dumping waste are clearly identified by record evidence whereas nothing definitively links the three Almo customers' wastes to Lipari Landfill. *Though Almo transported waste for*

---

**36.** Manor Health withdrew this argument at our hearing on this matter. We address this argument because even though Manor Health withdrew it, its other arguments seemed to subsume it. In addition, Firestone Tire and Rubber Company, a third-party defendant and Jonas customer, makes the similar argument that the Partial Consent Decree can be approved only if the plaintiffs are required as a condition of approval to promptly pursue settlement negotiations with parties similarly situated to the settling defendants. Firestone Letter Brief at 3. We reject this argument for the reasons indicated *infra.*

**37.** Manor Health states that prior to the negotiation of the decree, EPA had consistently identified Almo's link to Lipari as being synonymous with its status as a transporter for CBS, Hercules and Owens–Corning.

Moreover, the settlement's extinguishment of Manor Health's contribution rights vis-a-vis Almo's former customers CBS, Hercules and Owens–Corning is fundamentally unfair since it foists their liability onto Manor Health without affording the successor the opportunity to litigate their comparative culpability. In addition, Manor Health argues that the decree, if approved, would allow the United States a "double recovery" since it could recover from Manor Health because it transported the very waste allegedly generated by three settlors; that is, for a given amount of waste, the United States would receive two payments, one from the generator and one from the transporter. To obviate these concerns, Manor Health originally requested that we grant it the following relief: (1) order the EPA to allow them to participate as a *de minimis* settlor or (2) "enjoin" entry of the partial consent decree until such time as it is modified to provide that:

> (a) [a]s a group, the non-settlors should face liability only for waste not originating with a settlor; (b) the non-settlors [should] remain liable only for those response costs [not] reimbursed by settlements; and (c) Manor Health Care, individually, would face liability only for hazardous waste other than that from settlors CBS, [Owens–Corning], or Hercules and Manor's monetary liability would be reduced by these settlors' payments.

Manor Health Care Reply Memorandum at 3.

With respect to Manor Health Care's first argument, we believe that there is simply no authority for this Court to require the United States to treat a PRP as a *de minimis* party. Nor may we review the EPA's refusal to accord a party such status. Section 122(a) of CERCLA expressly provides that a "decision of the President to use or not to use the procedures [set forth in § 122] is not subject to judicial review." 42 U.S.C. § 9622(a). We read this provision as applicable to the EPA's decision not to enter into a settlement with a particular PRP. Indeed, we know of no authority, and none has been cited to us, which permits us to *compel* any litigant, much less the United States, to settle a lawsuit with a particular defendant. Finally, as to this issue, it is simply erroneous for Manor Health Care to insist that it is entitled to *de minimis* status merely because Almo's customers are accorded such treatment. The fact is that, at the very least, Almo transported more waste than any one of its three settling customers separately generated since it transported *all* three's waste to Lipari. In Manor Health's view, a transporter which transported 20% of the hazardous waste to a facility would be entitled to be considered a *de minimis* settlor if its forty customers, none of which contributed more than a 1% volumetric share, were so treated. This makes very little sense. Here, we have a similar scenario: the Government states that Almo transported 6.1% of the total volume of waste at Lipari. Its three *de minimis* customers generated at most, argues the United States, 1.3% of the total volume and thus "even if its volumetric share were reduced by the maximum contribution possibly attributable to its three customers, Almo would still be responsible for [4.8%] of the total volume. A [4.8%] contribution does not qualify Manor Health for *de minimis* status" under the terms of this settlement. United States Brief at 66. Moreover, even if the United States' determination that a party is not entitled to *de minimis* status were reviewable, we have not been convinced that its decision to use a 1% share as a rule of thumb for according a party *de minimis* status was arbitrary and capricious, or improper under any other relevant standard of review.[38] In sum, we will not order EPA to treat Manor Health as a *de minimis* party or

---

*these companies, the record indicates that it may have transported such wastes to sites other than Lipari.* See our discussion, *supra,* at 60–61.

**38.** One of the most expansive definitions of "minimal," the word used in Section 122(g), is

"extremely minute." *See* Webster's 3rd New International Dictionary at 1438 (1966). A 1% share seems wholly consistent with this definition.

refuse to accept the settlement because it was not so treated.[39]

■ Next, Manor Health's motion for an injunction will be denied. Not only has Manor Health made very little effort to articulate why it is entitled to such relief under the appropriate factors,[40] it requests this Court to, in essence, enjoin itself from entering the proposed decree. This request is extraordinary. If our entry of this decree is improper and deprives Manor Health of legal rights to which it is entitled, then the Court of Appeals will not hesitate to upset our ruling. This avenue of relief defeats any claim that Manor Health will be "irreparably harmed" if we enter this decree. In short, without listing the multiplicity of other reasons for not doing so, this Court refuses to enjoin itself.

We will, however, treat with Manor Health's contentions as arguments why the proposed decree is not fair, adequate and reasonable. Manor Health complains that the settlement is unfair because it extinguishes Manor Health's right to seek contribution from Almo's former customers, CBS, Hercules and Owens–Corning. Apparently, Manor Health believes such an extinguishment may be granted only if this Court forces an amendment to the decree which would provide that Manor Health cannot be held liable for response costs based on its transportation of CBS, Hercules and Owens–Corning's waste.

Manor Health views responsible parties as being liable, where no particular type of waste at the site is disproportionately hazardous, for only a proportion of the response costs equivalent to their percentage volumetric contribution of waste at the site. If a generator and a transporter are linked to a site because one generated and the other transported a certain shipment of waste, any settlement by one should extinguish the other's liability for response costs attributable to that waste. Otherwise, the United States would obtain a forbidden double recovery.

■ We agree with the United States that such reasoning is confused. While it is true that the settlement does extinguish Manor Health's contribution rights against all of the *de minimis* settlors, we do not understand why this must be accompanied by an excusal of all non-settlors for any liability for response costs attributable to conduct jointly engaged in by non-settlors and settlors as co-venturers. We agree with the Government that under Section 107 of CERCLA:

> Each liable entity, including transporters, is jointly and severally liable to the United States for recovery of response costs. *See United States v. Bliss*, 667 F.Supp. 1298, 1307 (E.D.Mo.1987); [*United States v.*] *Conservation Chemical, supra* [619 F.Supp. 162] at 175, 191 [W.D. Mo.1985]; *United States v. Northeastern Pharmaceutical and Chemical Co.* ("NEPACCO"), 579 F.Supp. 823, 846–47 (W.D.Mo.1984), *aff'd in part and rev'd in part on other grounds*, 810 F.2d 726 (8th Cir.1986), *cert. denied* [484 U.S. 848], 108 S.Ct. 146 [98 L.Ed.2d 102] (1987). Transporter liability is not extinguished whenever "co-venturing" generators satisfy their liability to the United States. Were this so, the statute would have expressed transporter liability in terms of "conditional" liability instead of "strict" liability; that is, transporters could only be held liable if the United

---

**39.** Third party defendant, Firestone Tire and Rubber Company also objects to the settlements on the ground that it should have been allowed to participate as a *de minimis* settlor. It wishes us to condition approval of the decree on the United States undertaking, promptly, "settlement negotiations with parties similarly situated to the settling defendant." Firestone Letter Brief at 3. We believe, as indicated above, that we have no authority to force EPA to engage in the CERCLA Section 122 settlement process. Indeed, such an intrusion upon executive power may implicate constitutional concerns.

**40.** To support a preliminary injunction, the moving party must demonstrate that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made and that there is a reasonable probability of eventual success on the merits. In addition, the Court must weigh the possibility of harm to the non-moving party as well as to any other interested persons and, when relevant, harm to the public. *Continental Group, Inc. v. Amoco Chem. Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980).

States were unable to recover its costs from the generators the transporter serviced, and only liable to the extent the generators the transporter serviced would be liable. While we could all conjecture on how the Congress *might have* structured liability for recovery of United States' response costs, the fact is that Congress determined that transporters, like generators, shall be jointly and severally liable to the United States.

United States Reply Brief at 68–69.

Manor Health misapprehends its status; as a PRP it remains potentially jointly and severally liable with all other PRPs for all response costs incurred at Lipari which are not inconsistent with the national contingency plan. It is not, potentially, jointly and severally liable only with its generator co-venturers; CERCLA does not limit a defendant's liability for response costs to some share proportioned on its volumetric share of the waste at Lipari. As such, Manor Health has no special claim to any funds obtained from CBS, Hercules, and Owens–Corning. Rather, it stands in the same stead as all the other non-settlors here, who bear the brunt of the risk that this settlement does not adequately reflect the settlors' equitable share of the liability.

This is a result which flows from the express language of CERCLA. Congress decided that a *de minimis* settlement under Section 122(g) would reduce the potential liability of all remaining non-settling PRPs by the amount of the settlement. 42 U.S.C. § 9622(g)(5). This reduction is not limited to non-settling parties who were co-venturers of a settlor, nor are such parties entitled to a greater reduction than other PRPs. And contrary to Manor Health's assertion, the statutory reduction provided for in Section 122(g)(5) leaves no room for a double recovery since the United States will not recover anything from non-settling defendants which it has already recovered from the settlors. *Rather, the most it may recover from non-settlors is its total response costs minus any amount recovered through settlements.*

We may not rewrite section 122(g)(5) to give Manor Health the additional protection it desires. When the time comes for this court to apportion liability for response costs among parties found jointly and severally liable, Manor Health may rest assured that all relevant evidence as to its liability will be considered carefully. In so doing, the court will exercise the discretion vested in it by CERCLA and apportion liability using "such equitable factors as [it] determines are appropriate." 42 U.S.C. § 9613(f)(1). As the United States points out, however, such an apportionment must await final resolution of liability issues as to each of the non-settling defendants and a determination of the amount of response costs, not inconsistent with the national contingency plan, for which liable non-settlors will be held responsible. 42 U.S.C. § 9607(a)(4)(A); *see United States v. Stringfellow,* 661 F.Supp. 1053, 1060 (C.D. Cal.1987); *see also O'Neil v. Picillo,* 682 F.Supp. 706, 725 (D.R.I.1988), *appeal docketed,* 883 F.2d 176 (1st Cir.1989) ("issues of fairness and equitable apportionment may be more properly addressed in a subsequent contribution action").[41]

**41.** Manor Health cursorily alleges that unless it is given the sort of liability insurance it seeks, the entry of this decree will violate its constitutional rights. It claims that CERCLA's extinguishment of non-contribution claims against settling parties constitutes a deprivation of property without due process of law.

Manor Health does little more than make this argument in passing. No real attempt is made to support this proposition. Suffice it to · say that this Court will, if the need arises, take what steps it regards as necessary to obviate any harm of constitutional dimension resulting from our entry of this consent decree today.

For now we only note our dubious view of Manor Health's bald assertion that Section 122(g)(5) unconstitutionally harms non-settlors. If Manor Health is right then the laws of eighteen states, which use the UCTA, are in danger. It would indeed be quite startling if the UCTA *pro tanto* rule, which has held sway for so long, were suddenly found to be unconstitutional. In fact, a district court in Massachusetts has very recently held that the contribution scheme set forth in § 113(f)(2) and § 122(g)(5) is not in conflict with either the due process or equal protection clauses. *United States v. Cannons Engineering Corp.,* 720 F.Supp. 1027, 1049–1051 (D.Mass.1989). We have been presented with no arguments which persuade us that *Cannons Engineering's* conclusion that these statutory

Moreover, it is worth noting that the entry of the proposed decree might well constitute a benefit to the nonsettlors, and especially Manor Health. Manor Health, as opposed to Hercules, CBS and Owens–Corning, is firmly linked by the evidence to Lipari. As Almo's settling customers could very well not be found liable *at all,* any contribution they make which reduces Manor Health's potential liability may be a windfall for Manor Health. Thus, on the present record, the possibility of a boon flowing from the decree is as likely as any deprivation.

Finally, Manor Health has made arguments based on the alleged failure of EPA to consider whether any *de minimis* settlor's waste was disproportionately toxic as compared to other waste at the site. As Manor Health does not contest the *de minimis* status of any settlor or point to any evidence that a particular settlor's waste was disproportionately toxic, we see no reason to deny entry of the decree on this basis.

## VIII. CONCLUSION

After considering the record, the arguments of the parties, and consulting the relevant authorities, this Court has concluded that entry of the proposed decree is appropriate. A copy of the decree, signed by the Court, is appended hereto.*

### ORDER

This matter having come before the court, and the court having considered the submissions of the parties;

It is, this 29th day of September, 1989, ORDERED that the motion by plaintiff for entry of the partial consent decree lodged with this court on July 28, 1988 is GRANTED.

provisions both further a valid legislative purpose and are rational is not the correct one.

* Decree omitted for publication.